**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| NICHELLE BROUSSARD, Individually and on behalf of S.B, a minor, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: _____ |
| v. | ) ) ) | |
| MICROSOFT CORPORATION, MOJANG AB, ROBLOX CORPORATION, INNERSLOTH, LLC MINICLIP, SA"AKA" MINICLIP, INC, TENCENT AMERICA, LLC, INC., EPIC GAMES, INC, EPIC GAMES INTERNATIONAL HOLDINGS, LLC, SONY INTERACTIVE ENTERTAINMENT, LLC, PUBG ENTERTAINMENT, INC., KRAFTON, INC., TENCENT INTERACTIVE ENTERTAINMENT GROUP ("TENCENT"), TENCENT MOBILE INTERNATIONAL, LTD., DELL, INC., DELL TECHNOLOGIES, INC., and APPLE, INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs NICHELLE BROUSSARD, Individually and on behalf of S.B. a minor, hereby file their *Complaint* against the Defendants—MOJANG AB, MICROSOFT CORPORATION, ROBLOX CORPORATI, N, INNERSLOTH, LLC, MINICLIP, SA"AKA" MINICLIP, INC,, TENCENT AMERICA, LLC, INC., EPIC GAMES, INC, EPIC GAMES INTERNATIONAL HOLDINGS, LLC, SONY INTERACTIVE ENTERTAINMENT, LLC, PUBG ENTERTAINMENT, INC., TENCENT MOBILE INTERNATIONAL, LTD KRAFTON, INC., DELL, INC., DELL TECHNOLOGIES, INC., and APPLE, INC.,—notifying each Defendant of Plaintiffs' claims for relief as available under Georgia law. In support thereof, Plaintiffs allege and

state:

# I.   NATURE OF THE ACTION

1.    Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.    Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering stop interacting with friends and/or family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.    Video game addiction causes rifts between minors and young adults with gaming-addiction and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.    Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.    Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.    The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, minor game players) addicted to the Defendants' video game products in order to maximize Defendants' profits.

7.    Defendants manufactured, published, marketed, and sold video games and gaming

products, including those played by S.B., which Defendants had specifically developed and designed to cause the addiction experienced by S.B. and other users.

8.      Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.      Defendants rely on microtransactions to increase their profits from individual games.

10.     Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11.     Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12.     Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game products is their own bottom line.

13.     By making their games addictive, Defendants can maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game products or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

14.     "Microtransactions" often occur because of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive

and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

15.     By keeping minors and young adults playing longer—and spending more money in the game in the process—Defendants are causing physical and mental harm to users while consistently increasing their revenue.

16.     By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

17.     Defendants are exploiting consumers, particularly minors and young adults, with unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

18.     Video game addiction impacts thousands of youths and their families across the country, including in Georgia.

19.     Plaintiffs are one of those families who have been negatively impacted by the addiction and harm caused by each of Defendants' products.

20.     Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused S.B.'s brain damage and gaming addiction, along with Plaintiffs' other damages as described herein.

21.     As a result of that gaming addiction and harm caused by Defendants' products, S.B. specifically suffers from: brain damage, trouble focusing and being off task during school hours, acting disrespectfully, lying to parents and teachers, gamers rage, dropping grades, severe emotional distress, diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts, of which a  severity level that required outpatient counseling and private tutoring.

22.     S.B. was a straight-A student prior to playing video games.

23.     S.B. concealed a second laptop in their home that was not purchased by parents so S.B. could hide and lie about their video game use.

24.     S.B. plays the following games approximately 12-15 hours per day: Minecraft on his school-issued laptop,  Roblox, PUBG Mobile and  Among Us on his Apple I-Phone, and Fortnite on his friend's PlayStation 4.

25.     S.B. has been diagnosed with worsening  Attention Deficit Hyperactivity Disorder ("ADHD") due to internet gaming addiction.

26.     As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, S.B. requires treatment, including out-patient counseling, private tutoring, and an Individual Education Plan at School.

27.     As a result of S.B.'s gaming addiction and the harm proximately caused by Defendants' misconduct, S.B.'s mother, Nichelle Broussard has personally witnessed and been affected by S.B.'s gamer's rage and withdrawal symptoms. Nichelle Broussard has personally experienced emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of Defendants' misconduct.

28.     Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct, and they are entitled to compensation and other damages from Defendants under Georgia law.

29.     Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiffs, but countless other Georgians and citizens of the world. For this conduct, they should be punished, and punitive damages should be assessed against each

Defendant for their respective misdeeds and unlawful conduct.

## II.    PARTIES

30.    S.B. a minor, is and at all times relevant to this action, was a citizen and resident of the State of Georgia whose principal place of residence being in Cobb County, Georgia.

31.    S.B. is 14 years old at the time of filing of this lawsuit.

32.    S.B. began playing video games at 12 years old.

33.    S.B. has continued to play video games at an increasing and uncontrollable pace since that time.

34.    S.B. specifically played and continues to play Minecraft on his school-issued Dell laptop;  and Fortnite on his neighbor's PlayStation 4beginning in April 2022 when he was twelve years old to present.

35.    S.B. plays these games across multiple platforms—but specifically plays them on their school-issued Dell laptop and Apple iPhone.

36.    S.B. was provided free subscriptions to the educational version of Minecraft on a school-issued Dell laptop, which did not have any parental controls nor did this require any parental consent.

37.    S.B. also played Roblox, PUBG Subway Surfers and Among Us on his Apple iPhone.

38.    Plaintiff Nichelle Broussard is, and at all times relevant to this action was, a citizen and resident of the State of Georgia whose principal place of residence is in Cobb County, Georgia.

39.    Nichelle Broussard is the parent of S.B. and represents S.B.'s interests in this lawsuit.

40.     Nichelle Broussard also seeks redress on her own behalf for economic injuries and losses sustained as a result of S.B.'s brain damage and gaming addiction proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, and for actual damages and injuries Nichelle Broussard personally sustained as a result of Defendants' deceptive, outrageous, and fraudulent acts.

41.     Defendant Microsoft Corp. ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052.

42.     Microsoft is authorized to do and does business in the State of Georgia. Microsoft's registered agent for service of process is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

43.     At all times material hereto, Microsoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series, either directly or indirectly, to members of the general public within the State of Georgia including to Plaintiffs.

44.     Defendant Mojang AB ("Mojang") is Swedish Company with its principal place of business in Stockholm, Sweden.

45.     At all times material hereto, Mojang developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Minecraft series, either directly or indirectly, to members of the general public within the State of Georgia, including Plaintiffs.

46.     Mojang is a wholly owned subsidiary of Microsoft, who acquired Mojang and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible

for any damages that may be assessed based on Mojang's wrongdoing in connection with its Minecraft video game product.

47.     Microsoft and Mojang (the "Minecraft Defendant) acted in concert in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft video game series with addictive features and technologies contained therein.

48.     Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

49.     Roblox Corp. is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game, Roblox, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

50.     Defendant InnerSloth LLC ("InnerSloth") is a Washington limited liability company with its principal place of business at 7345 164th Avenue NE, Suite I45-1316, Redmond WA, 98052

51.     At all times material hereto, InnerSloth designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Among Us either directly or indirectly, to members of the general public within the State of Georgia,  including to Plaintiffs.

52.     Kiloo Games is located in Aarhus, Midtjylland, Denmark with a principal place of business located at 68 Bülowsgade, Aarhus C, Region Midtjylland 8000, DK.

53.     Kiloo Games is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Subway Surfers video game series and platform, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

54.     SYBO Games is a co-developer and co-publisher of Subway Surfer mobile games and a subsidiary of Miniclip, SA "aka" Miniclip located in Coppenhagen, Denmark.

55.     In June 2022, Miniclip, SA "aka" Miniclip purchased SYBO Games for an undisclosed amount.

56.     Miniclip is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Subway Surfers video game, Miniclip, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

57.     In February 2015, Tencent acquired majority stakes of Miniclip.

58.     Tencent Holdings, Ltd. Is a Chinese multinational technology conglomerate headquartered in Shenzhen.

59.     Tencent America, LLC is domiciled in Delaware and may be served with process upon it's registered agent, Paracorp Incorporated, 2140 S Dupont Hwy, Camden, Delaware, 19934.

60.     Tencent America, LLC is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its Subway Surfers video

game, Tencent America, LLC either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

61.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

62.     Defendant Epic Games International Holdings, LLC is a Delaware corporation and may be served with process upon it's registered agent, The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

63.     Epic Games is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

64.     Defendant Sony Interactive Entertainment LLC ("Sony") is a California company with its principal place of business at 2207 Bridgepointe Pkwy., San Mateo, CA 94404.

65.     Sony is a wholly owned subsidiary of Sony Group Corporation, a Japanese company with its principal place of business in Tokyo, Japan. Sony Group Corporation is, upon information and belief, the sole member of Sony.

66.     Sony is authorized to do and does business in the State of Georgia, and Sony's registered agent for service of process is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

67.     At all times material hereto, Sony designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the PlayStation video game consoles, including S.B.'s friends PlayStation 4, and video games for

use and play on the PlayStation consoles, either directly or indirectly to members of the general public, within the State of Georgia, including to Plaintiffs.

68. At all times material hereto, Sony designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the PlayStation Network, PlayStation Store, PlayStation Plus, and PlayStation Mobile, which are available product features designed for use with the PlayStation gaming consoles and first-party video games, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

69. Sony acted in concert with Epic Games to distribute, market, supply, and/or sell the Fortnite video games and all in-game downloadable product upgrades and in-game purchases contained therein on the PlayStation Store or through the PlayStation Network in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

70. Defendant PUBG Entertainment, Inc. ("PUBG") is a California company with its principal place of business at 611 Bollinger Canyon Rd, Suite 150, San Ramon, CA 94583.

71. At all times material hereto, PUBG developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming PUBG Mobile series either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

72. Defendant Krafton, Inc. ("Krafton") is a South Korean corporation with its principal place of business in Bundang-gu, Seongnam, South Korea.

73. At all times material hereto, Krafton developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

the video gaming PUBG Mobile series either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

74.     Defendant Tencent Interactive Entertainment Group ("Tencent") is a Chinese company with its principal place of business in Shenzhen, China.  Tencent is a wholly-owned subsidiary of Tencent Holdings Ltd., a Chinese holding company with its principal place of business in Shenzhen, China.

75.     Defendant Tencent Mobile International, Ltd. is a Hong Kong corporation with a principal place of business located at  29/F Three Pacific Place 1 Queen's RD E Wan Chai Hong Kong.

76.     Tencent Mobile International, Ltd. is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

77.     Defendants PUBG, Krafton, and Tencent (PUBG Defendants) acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming PUBG Mobile series with all the addictive features and technologies contained therein.

78.     Dell Inc. ("Dell") is a Delaware corporation with its principal place of business at One Dell Way, Round Rock, TX 78682.

79.     At all times material hereto, Dell developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

personal computers used for video gaming directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

80.     Dell Technologies Inc. ("Dell Tech.") is a Delaware corporation with its principal place of business at One Dell Way, Round Rock, TX 78682.

81.     At all times material hereto, Dell Tech developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold personal computers used for video gaming directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiffs.

82.     As parent company of Dell, Dell Tech is responsible for any damages that may be assessed against Dell.

83.     Defendants Dell and Dell Tech acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling school-issued Dell laptops, including S.B.'s Dell Laptop, either directly or indirectly, to school districts and members of the general public within the State of Georgia, including to Plaintiffs, with all the addictive features and technologies contained therein.

84.     Dell and Dell Tech acted in concert with the Minecraft Defendants to distribute, market, supply, and/or sell the Minecraft video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, throughout the State of Georgia, including to Plaintiffs.

85.     Defendant Apple, Inc. ("Apple") is a Delaware corporation with its principal place of business at 1 Apple Park Way, Cupertino, CA 95013.

86.     Apple is authorized to do and does business in the State of Georgia, and Apple's registered agent for service of process is 289 S Culver Street, Lawrenceville, GA 30046.

87.     Apple acted in concert with Roblox Corp. to distribute, market, supply, and/or sell the Roblox video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, throughout the State of Georgia, including to Plaintiffs.

88.     Upon information and belief, each Defendant was aware—or should have been aware—that other game developers and publishers, including the other Defendants named herein, were engaging in the same behavior.

89.     Upon information and belief, Mojang, Microsoft, Roblox, Dell, Dell Tech, and Apple all acted in concert and entered into licensing agreements to utilize the same patents to keep users, including S.B., addicted to Defendants' video games.

90.     At all times material hereto, each Defendant targeted consumers/purchasers, including minors like S.B. to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends.

91.     Each Defendant—with knowledge of S.B.'s age and Georgia residency—targeted S.B. and induced S.B. to enter into microtransactions.

92.     Upon information and belief, each Defendant—with knowledge of S.B.'s age and Georgia residency, allowed third parties to target S.B. and induce S.B. into microtransactions within Defendants' products.

93.     Upon information and belief, there may be individuals, corporations, or entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such

products with knowledge and intent that such products be sold in the State of Georgia—and who also may be liable for some or all of Plaintiffs' injuries and damages as described herein. Despite reasonable and diligent inquiries by Plaintiffs, the identity of said tortfeasor(s) has not been determined as of this date and, therefore, these potential tortfeasors cannot be identified as Respondents in discovery, and it is necessary to conduct discovery on Defendants in order to determine the identity of said tortfeasor(s). If a such a "John Doe" tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint in accordance with Georgia law as provided in OCGA § 9-11-15.

### III.   <u>JURISDICTION AND VENUE</u>

94.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of the Complaint.

95.   This Complaint brings forth claims for relief arising under the laws of the State of Georgia, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce. Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Georgia that exceed the sum or value of $75,000, exclusive of interest and costs.

96.   This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

97.   This Court has personal jurisdiction over each Defendant because each routinely conducts business in Georgia and has sufficient minimum contacts in Georgia to have intentionally availed itself to this jurisdiction by marketing video games and transacting business in the State of Georgia.

98.   At all relevant times, each Defendant was present and transacted, solicited, and

conducted business in the State of Georgia through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

99.     Defendants are conclusively presumed to have been doing business in this State and are subject to Georgia's long arm jurisdiction.

100.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Georgia and throughout the United States.

101.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.     <u>GENERAL ALLEGATIONS</u>

### A.  The Rise of Video Games

102.    A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

103.    Video games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

104.    A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

105.    Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control,

manipulate, and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

106.    Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board.

107.    The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

108.    Yet, the industry is young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality platforms.

109.    Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time which resulted in a long and slow method of earning profits.

110.    A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

111.    Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games that can take hundreds of hours to beat, there is a staggering amount of gameplay available to users in modern video games.

112.    The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

113.    The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

114.    In 2023, the video game industry's revenue was $365.6 billion globally.

115.    With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors, including J.B.

116.    The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable products.

117.    Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

118.    To entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money on microtransactions.

**B. Microtransactions**

119.    Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

120.    The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly to meaningfully advance the game.

121.    Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the

items through regular game play.

122.    Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

123.    Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

124.    While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

125.    Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

126.    In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

127.    Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

128.    Developers and publishers can also use microtransactions to lock potentially significant product upgrades and "easter eggs" designed to extend gameplay and increase a player's dopamine levels behind paywalls.

129.    Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

130.    The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase

game.

131.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

132.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

133.    Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

134.    For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

135.    Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

136.    Microtransactions are not only benefiting the gaming industry publishers and developers; the platforms that allow the microtransactions take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their platforms.

137.    While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

138.    Each Defendant knows this, or should be aware of this, because they have

purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

**C. The Monetization Schemes Built into Video Games**

139.     Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

140.     The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

141.     Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

142.     Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

 a.  The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

 b.  "Chasing": encouraging players to keep playing to get back any money they just lost;

 c.  "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

 d.  "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

 e.  "Entrapment": convincing players they are about to win, or they have invested

enough to win, but if they stop playing they will miss out on the win; or

    f.   The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

143.   The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

144.   Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

145.   Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

146.   Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

147.   Games linked to a game player's social network pages also gather information about players and Defendants use this information to target products and microtransactions to users based on that player's unique interests and preferences.

148.   As the game system gathers more data on how various types of players behave

under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

149.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

150.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

151.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals, and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

152.    These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

153.    A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

### i.    Loot Boxes

154.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters

or weapons.

155.    Through purchasing a loot box, the player acquires a seemingly random assortment of items.

156.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

157.    Loot boxes require no player skill and have a randomly determined outcome (*i.e.,* prize).

158.    Loot boxes are essentially a lottery that provides a way for gaming developers, publishers, and even game platforms to increase revenue through underage gambling.

159.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

160.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

161.    Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

162.    Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

163.    Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy

multiple boxes.

**ii. Rubber-Banding**

164.    Another example of a monetization scheme is "rubber-banding."

165.    Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

166.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

167.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

168.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

169.    Such technical sophistication in these purchasing systems aims to reduce the player's uncertainty or reluctance regarding purchasing decisions.

**iii. Pay-To-Win**

170.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

171.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

172.    For example, paying players may get access to certain capabilities such as access

to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat for ordinary, non-paying players.

173.     Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

**D.  Patents Target Minors to Increase In-Game Spending**

174.     Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

175.     Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

176.     Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

a.  U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

b.  U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined

number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c.  U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d.  U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e.  U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f.  U.S. Patent No. 8,702,523 B2, assigned to Microsoft Corporation, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and

playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with the patent:

    i. Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

    ii. The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g. U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h. U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows

players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.  U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours

to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k.  U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l.  U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m.  U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n.  U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item

bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o.  U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p.  International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, and send selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

177.    There was once a time when such lopsided consumer video game monetization-related inventions would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

178.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

179.    It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E.  These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

180.    What players and parents, including Plaintiffs, often do not understand is that their gaming experience is not accidental, but rather carefully engineered by the game's manufacturers.

181.    In every game, there are several hundred, or maybe even thousands, of heavy players who spend much more money in the game than the other players.

182.     Companies employ tactics specifically to gain heavy users—or "whales" or "VIPs"—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

183.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

184.    To target those who may be likely to spend additional money in the game, developers and publishers, like Defendants, will monitor players and collect user information, from

their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

185.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

**F. Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted**

186.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, artificial intelligence (AI), feedback loops, continuously adding new game content, and using tactics to ensure users are creating habits in their gameplay.

187.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

188.    For instance, Activision holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

189.    Upon information and belief, Activision works in concert with the other Defendants to license this patented technology and allow all Defendants to control users' experiences within the game.

190.    Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

---

[1]   *See* Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

191.    Feedback loops are systems where the game reacts to how well the player is doing to make the games more rewarding, or for tougher games, more challenging.

192.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

193.    There are two kinds of feedback loops: positive and negative.

194.    Positive feedback loops mean that when a player is doing well, the game rewards them with things to help them do even better.

195.    Negative feedback loops, on the other hand, add a challenge to a game when players are doing too well.

196.    Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

197.    By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

198.    A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed using negative feedback loops.

199.    When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

200.    In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

201.    Gaming companies, like Defendants, also know that the best way to get a player to

come back to the game and spend money is to make the game a habit or part of their life.

202.    Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

203.    Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

204.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

205.    By constantly adding downloadable content, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the content and the game.

**G.  Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

206.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to hand over their money or data.

207.    The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made.

208.    The purpose behind "dark patterns" is to take advantage of consumers' cognitive

biases and steer their conduct or delay access to information needed to make fully informed decisions.

209.    Research shows that "dark patterns" are highly effective at influencing consumer behavior.

210.    The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

211.    Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

212.    "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

213.    "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

214.    The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

215.    Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example, online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving

consumers or manipulating them into taking unwitting or detrimental actions.

216.    Some dark patterns manipulate consumer choice by inducing false beliefs—such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

217.    Other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

218.    Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

219.    Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

220.    Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

221.    Microtransactions built into many video games by design are a form of drip-pricing.

222.    Each Defendant uses, or has used at relevant times, "dark patterns" in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

## H. Cloud Gaming Enhances Defendants' Predatory Activities

223.    Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

224.    Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

225.     Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

226.     Cloud gaming platforms allow users to stream any game available on the platform at any time.

227.     Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

228.     This means players have easy access to hundreds or even thousands of games at one time.

229.     What's more, the catalogue of games on streaming platforms is ever-changing and evolving.

230.     The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming platform, by ensuring they always have something new and different to play.

**I.     Defendants' Predatory Schemes Created a Generation of Gaming Addicts**

231.     The feedback loops, other psychological properties, and cloud gaming platforms are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, platforms, and predatory monetization schemes work together to addict players to the games.

232.     During the last three decades, video games have become one of the major pastimes

and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

233.    In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

234.    Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

235.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

236.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

237.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

238.    The main features of gaming disorder are impaired control over gaming, increasing

---

[2] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[3] *Id.*

priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

239.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

240.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

241.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

242.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

243.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

244.    For instance, IGD may be an impulse control disorder like compulsive gambling.

245.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

246.    These nine criteria are also outlined in the DSM-5.

247.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

248.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

249.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

250.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

251.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

252.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

253.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

254.    Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

255.    These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

256.    Comorbidity studies also indicate that individuals with ADHD may have an

increased susceptibility to developing gaming disorder.

**J.  Effects of Video Games on Adolescent Brains**

257.    Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

258.    Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

259.    Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

260.    In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

261.    Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

262.    Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

263.    Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

264.    The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

265.     The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

266.     This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

267.     Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

268.     Brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

---

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

269.     Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

270.     Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

271.     One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

272.     Research has shown that a minor with a diagnosis of ADHD, autism, or ODD is at a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

273.     Research has shown that while video games may foster creativity in children, such benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

---

[5] *Id.*

274.    Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

275.    These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

276.    As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

277.    As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

278.    By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

### K.  S.B.'s Addiction, Injuries, and Damages

279.    S.B. is a fourteen-year-old individual addicted to video games; specifically, S.B. is addicted to playing Minecraft and Roblox.

280.    S.B. plays across multiple platforms, including on their school-issued Dell laptop and iPhone.

281.    Despite parental efforts to limit game time—efforts made astonishingly difficult, if not impossible, by the absence of parental controls within each Defendant's product, including but not limited to the absence of time-limit restrictions in Defendants' products, and Defendants'

allowance of cross-sharing and cross-platform play using Defendants' products without providing parents' notice of this design defect or the ability to have control their child's use of the product, S.B. spends approximately 12-15 hours per day using Defendants' products to play video games.

282.    S.B. cannot refrain from gameplay and/or spending money while using Defendants' products.

283.    S.B. has spent approximately countless hours using Defendants' products and playing video games which do not allow a parent to track time in the educational versions.

284.    S.B. has been suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), Sleep Deprivation, internet gaming disorder and has also experienced the following as a result of the brain damage, gaming addiction and harm caused by Defendants' products: e.g., inability to limit game playing time, lack of interest in and loss of friends at school, social isolation, change in eating pattern, withdrawal symptoms (e.g., anger, cursing, physical outbursts, depression) when Defendants' products are taken away, and an inability to perform schoolwork independently at a grade level for S.B.'s age.

285.    As a result, S.B. has undergone out-patient counseling, private tutoring, and an Individualized Education Plan at school.

286.     Nichelle Broussard is an engineer who has lost hope in her ability to control S.B.'s game playing time and worries about S.B.'s mental and physical condition when attempting to take games away from S.B..

287.    Nichelle Broussard has experienced mental anguish, emotional distress, pain, suffering, and financial loss as a result of each Defendant's intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein—and is reasonably likely to

continue to experience those injuries in the future due to the permanent impact of Defendants' wrongs on Plaintiffs.

288.    As a result of S.B.'s gaming addiction and the harm proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, Nichelle Broussard has experienced loss of society and companionship—and has been financially damaged due to S.B.'s addiction and uncontrollable in-game spending.

**L.  Defendants' Conduct Specifically Led to Plaintiffs' Damages**

289.    Each Defendant is aware that its video games are harmful to minors and young adults because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

290.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

291.    Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that all Defendants are causing daily in the United States.

292.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiffs.

**M.  Defendants' Products Used by S.B.**

**<u>Minecraft</u>**

293.    Minecraft is a 3D sandbox video game first developed and published by Mojang who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

294.    Minecraft can be played on PC, various gaming consoles, and mobile devices.

295.    Since the first full release of Minecraft in 2011, the video game has been continuously updated with many major and minor product update, including but not limited to gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

296.    In May of 2012, Mojang and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

297.    The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including but not limited to a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the internet.

298.    With the introduction of Minecraft as a video game product for play on gaming consoles like Xbox 360, the Minecraft Defendants introduced microtransactions and made in-product downloadable content available for purchase.

299.    All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance game play and keep players engaged in the product.

300.    In December of 2013, Mojang and Sony Interactive Entertainment, LLC released Minecraft for play on PlayStation 3.

301.    Microsoft acquired Mojang and all product rights to Minecraft in 2014.

302.    That same year, Minecraft was made available for play on Xbox One and PlayStation 4.

303.    In 2015, Minecraft was made available for play on the Wii U, which is a gaming console product designed, manufactured, and sold by Nintendo of America, Inc.

304.    In May of 2017, Minecraft was made available to play on the Nintendo Switch, and then in September of 2017 for Nintendo 3DS.

305.    On September 20, 2017, the Minecraft Defendants released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform play between those products and became known as the *Bedrock Edition* of Minecraft.

306.    The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform play between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers.

307.    In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform play for users with a Xbox Live account.

308.    The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform play with Microsoft's Xbox One and Xbox Series X/S, Sony's PlayStation 4 and PlayStation 5, Nintendo's Switch, personal computers, mobile phones, and virtual reality gaming headsets.

309.    Minecraft is the best-selling video game to date, with over 300 million copies of its games sold.

310.    Minecraft has over 163 million monthly active players.

311.    Regardless of version or platform, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensions freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

312.    While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

313.    Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around picking up and placing block-objects in a 3D grid.

314.    In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players exploration, using a map seed that is obtained from the system clock at the time of world creation.

315.    Although a single video game product, Minecraft gameplay can be different each and every time a player logs in to play.

316.    Minecraft includes multiple game modes for a variety of gameplay, including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight.

317.    Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world.

318.    When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard."

319.    Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play.

320.    Each player's main task in Minecraft is to survive all the problems using specific resources.

321.    When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling.

322.    The Minecraft Defendants designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into the game product prays upon the chemical reward receptors of users' brains to create addictive engagement.

323.    These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

324.    On certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games.  These notifications pop up on screen whether players are already playing Minecraft or not.

325.    These interactive features serve only to lure players to spend more time in the game.

326.    Once a player succeeds with one stage, they move on to the next one.  Essentially, Minecraft can last for eternity if the player is not strong-willed enough to stop playing.

327.    Minors and players with neurodivergent diagnoses, such as ADHD, can easily become hyper focused and addicted to building worlds within Minecraft.

328.    The Minecraft Defendants were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

329.    At the expense of users' mental and physical well-being, the Minecraft Defendants fail to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

330.    The Minecraft Defendants tout the game as educational and market it to educators

for use in the classroom:

**GET MINECRAFT EDUCATION FOR YOUR CLASSROOM**

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.[6]

331.    The Minecraft Defendants offer teachers ready-built lessons and curriculums

centered around their game:

_____

[6] https://education.minecraft.net/en-us



[7]

332.    The Minecraft educational game products offered by the Minecraft Defendants to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

333.    The Minecraft Defendants do not adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

334.    The Minecraft Defendants are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

335.    The Minecraft Defendants intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

336.    The Minecraft Defendants have profited from the release of their addictive video game product to the public.   For instance, in 2021, the Minecraft video game generated approximately $380 million across all different gaming platforms.

---

[7] https://education.minecraft.net/en-us

**Roblox**

337.    Roblox is an online video game, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

338.    Roblox Corp.'s "mission" for Roblox is have a billion people actively using and playing its game each day:



339.    Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; however, with the release of Roblox for play on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of people (particularly minors) grew exponentially.

340.    Roblox Corp. also saw an accelerated increase in the numbers of consumers downloading and playing Roblox as a result of the Covid-19 pandemic.

341.    As of August of 2020, Roblox had over 164 million monthly active users, with more than half of those users being American children under age 16.

342.    The numbers of consumers, particularly minors, using and playing Roblox continued to grow in 2023, when Roblox Corp. released versions of its Roblox product for play on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest

---

[8] https://corp.roblox.com/

Pro.

343.    Roblox Corp. markets Roblox as accessible on any device and, as of 2024, has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



344.    Currently, Roblox has over 66 million daily active users and over 217 million monthly active users, with more than 50% of consumers playing Roblox being under age 13.

345.    Roblox Corp. describes Roblox as an online, social gaming platform and game creation system that allows users to play games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio.

346.    Roblox Corp. designed the game-creation aspect of its product to allow players to create their own Roblox video games, as well as purchasable, one-time "game passes" and "developer products" microtransactions, for play and purchase by other Roblox users, including minors.

347.    Roblox Corp. designed the social-gaming aspect of its product to allow players to play Roblox games (or experiences) created by other users, which includes allowing players to

---

9 https://corp.roblox.com/

buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

348.   Roblox is free to play; however, Roblox is designed to encourage in-game purchases and product upgrade microtransactions, which can be purchased using Robux, the game's virtual currency.

349.   Robux can be obtained (a) purchased with real currency; (b) received a part of a recurring stipend given to users with a Roblox Premium membership; and (c) earned from selling "game passes" or "developer products" to other Roblox players.[10]

350.   Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

351.   For instance, corresponding with the increase of Roblox players due to the Covid-19 pandemic, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had been increased by 107% from its 2020, which had themselves been an 111% increase over 2019.

352.   Roblox Corp. specifically designed Roblox with certain addictive properties—at the risk of children's mental and physical health—to profit from product user's extended, long-term gameplay and corresponding in-game spending.

353.   Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their game includes the best psychological traits and technologies for player retention and addiction.

354.   Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, players can create games and maps for other users to try and play,

---

[10] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

making it a challenge in and of its own. Through research and product development, Roblox Corp. learned that when playing games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the game player's brain to seek these dopamine hits on a more regular or compulsive basis leading to abuse, addictive behavior, and video game addiction.

355.    Additionally, the variety within Roblox ensures that users are never bored and want to stop playing the game; there are always new challenges, maps, and characters to try, making the game feel like an ever-evolving entity that never stops providing entertainment.

356.    The ability for users to create their own games and challenges, combined with users' ability to spend real-world funds to change their avatar's image and abilities, makes sure that the gaming experience is different for players each time they log in.

357.    Such constant variety keeps players "hooked," or coming back daily and playing for hours.

358.    Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

359.    Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions to advance in the game, resulting in addicted and incompetent users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

360.    Roblox Corp. does not adequately inform users of the inherent risks involved with

using and playing Roblox or that the game was designed to addict and harm users

361.    Though it is equipped with the knowledge of the addictive risks inherent in its game, Roblox Corp. has failed to inform the public, users, or parents of such risks.

362.    Roblox Corp. describes its game as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[11]

363.     Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



[12]

364.    While marketing its video game as an educational tool to benefit minors and neurodivergent individuals, Roblox Corp. does not disclose the psychology and addictive characteristics behind Roblox's design or that Roblox contains numerous addictive principles that are negatively impacting minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

**Among Us**

1.    Among Us is an online multiplayer game developed and published by InnerSloth.

---

[11] https://corporate.roblox.com/faq/
[12] https://education.roblox.com/

2.      Among Us was originally released in 2018 for iOS and Android devices and for Windows later the same year. In December 2020, it was available for the Nintendo Switch, with PlayStation 4, PlayStation 5, Xbox One, and Xbox Series X/S availability the following December. A virtual reality adaptation called Among US VR was released in November 2022.

3.      Among Us has been a popular video game. By September 2020, InnerSloth reported that the game had more than 100 million downloads. InnerSloth further stated that the game had 60 million daily active users.

4.      Among Us is a space-themed, multiplayer social deduction game in which players attempt to uncover other players' hidden roles or team allegiance. The involves four to fifteen players, each of whom has a role as either a "Crewmate" or "Impostor."

5.      Crewmates must complete assigned tasks on the game map and attempt to identify and eject the Impostors. The Impostors attempt to kill the Crewmates, implicate innocent Crewmates, and work to conceal their roles as Impostors and to sabotage tasks undertaken by the Crewmates.

6.      The Crewmates win if they successfully eject all Impostors or complete all assigned tasks. The Impostors win if they kill or eject all Crewmates or successfully sabotage a critical system on the map.



7.    Among Us includes certain social media aspects among players, such as friend lists and interactive chats. This creates a type of feedback loop that also motivates players to continue playing.

8.    In order to determine the Imposters, players can call a group meeting in the game, during which players discuss—via the in-game text chat or an external voice chat application such as Discord—who they believe to be Imposters.

---

[13] https://www.innersloth.com/games/among-us/



14

9.     There are currently five "Maps" or locations in which the Among Us game is set and played.

10.     Each version of Among Us is based on the same underlying design and incorporates largely similar product components, with variations mostly with respect to the version's storyline.

11.     Among Us employs several in-game currencies which can be used to purchase items in the shop such as skins, hats, and other items.

12.     One currency are "Beans." Beans are obtained through gameplay. Beans are awarded to a player by completing tasks, winning rounds, and other in-game achievements. The amount of Beans may be increased through a multiplier bonus which is earned by leveling up. A

---

14 https://www.innersloth.com/games/among-us/#images-5

player receives Beans only at the end of a game. If the player leaves before the end of a game, he does not receive any Beans.

13.     Stars are another currency; however star cannot be earned, they must be purchased using real money. Stars are used to purchase "Cosmicubes," which are interactive bundles containing cosmetics—hats, skins, nameplates, visors, or pets—that a player can use to customize their character.

14.     The third in-game currency is Pods. Pods are used to purchase cosmetics within a particular Cosmicube. Pods are earned at the end of a round.

15.     The use of these in-game currencies are a positive feedback loop that rewards continued game play and encourages addiction, especially with regard to minors and neurodivergent individuals.

16.      Combining addictive feedback loops with fast-paced play, satisfying graphics and sounds, and other dopamine lifts make Among Us additive to players, particularly minors and neurodivergent individuals.

17.     InnerSloth is aware that Among Us includes—and was designed with—specific psychological aspects to encourage continuous gameplay and eventually lead to addiction, especially to minors and neurodivergent individuals.

18.     Upon information and belief, InnerSloth is specifically designed Among Us in concert with psychologists and neuroscientists to include addictive features.

19.     Upon information and belief, InnerSloth has licensed patented addictive technologies from other video game developers and included those addictive technologies in Among Us.

20.     Though InnerSloth knew of the addictive features and technology included in the Among Us games, but does not inform users of the risks inherent with playing this game, nor does InnerSloth adequately inform users that the game is designed to be addictive and harm users.

**Subway Surfers**

365.     Subway Surfers is an "*endless runner"* mobile game co-developed by Kiloo and SYBO Games.

366.     The player takes on the role of an average teen (or, on rare occasions, a young adult) vandalizing a subway train with spray paint, and is caught by *The Guard* and his *dog*. The player must run away from the two, who are chasing the player.

367.     An endless runner game is a type of video game that has a never-ending level because the  player character runs for an infinite amount of time while avoiding obstacles.

368.     Subway Surfers was originally released on May 24, 2012.

369.     The Subway Surfers video game runs on Unity Engine which is compatible with iOS, iPadOS, HarmonyOS, Android, Web browser, Windows 10 Mobile, Windows Phone 8, and Amazon Fire Tablet.

370.     In March 2018, *Subway Surfers* became the first game on the Google Play Store  to cross the one billion downloads threshold.[15] In May 2018, *Subway Surfers* crossed the two billion download mark.[16] App Annie reported *Subway Surfers* as the #2 downloaded game of all time in the iOS App Store.[17]

---

[15] "Subway Surfers gets record 1 billion downloads on Google Play Store". *AndroidAuthority*. 16 March 2018.
[16] Harris, Iain (30 May 2018). "Subway Surfers sails past the two billion download mark"
[17] "Facebook tops most downloaded apps of all time"

371.   In December 2019, SYBO Games announced that *Subway Surfers*, according to AppAnnie statistics, crossed the 2.7 billion download mark. *Subway Surfers* was the most downloaded mobile game of the decade from 2012 to 2019.[18]

372.   Subway Surfers has in-game purchases that include "Daily Challenges" and "Season Hunts" which provide rewards for unique movements throughout gameplay. Up to 18 characters can be unlocked using coins, keys, in-game purchases, collecting specific items, to 18 characters can be unlocked using coins, keys, in-game purchases, collecting specific items, or connecting to a Facebook account. Most characters have up to 2 different outfits. Meanwhile, up to 17 hoverboards can be unlocked with the same methods. Each has different abilities that can assist the player. When the game updates to a new location, a new character, and hoverboard will be available temporarily until the next update.

373.   Subway surfers targets minors without adequate age verification:

---

[18]   "'Subway Surfers' was the most downloaded mobile game of the decade. See the top 10 here"



374.   The use of these in-game currencies are a positive feedback loop that rewards continued game play and encourages addiction, especially with regard to minors and neurodivergent individuals.

375.   Combining addictive feedback loops with fast-paced play, satisfying graphics and sounds, and other dopamine lifts make Subway Surfers addictive to players, particularly minors and neurodivergent individuals.

376.   The Subway Surfer Defendants are aware that Subway Surfers includes—and was designed with—specific psychological aspects to encourage continuous gameplay and eventually lead to addiction, especially to minors and neurodivergent individuals.

377.    Upon information and belief, the Subway Surfer Defendants specifically designed Subway Surfers in concert with psychologists and neuroscientists to include addictive features.

378.    Upon information and belief, Subway Surfer Defendants have licensed patented addictive technologies from other video game developers and Platforms such as Apple Play, Google Play and Facebook and included those addictive technologies in Subway Surfers.

379.    Though Subway Surfer Defendants knew of the addictive features and technology included in the Subway Surfer games, the Subway Surfer Defendants and co-conspirators did not inform users of the risks inherent with playing this game, nor did the Subway Surfer Defendants and co-conspirators adequately inform users that the game is designed to be addictive and harm users.

**Fortnite**

380.    Fortnite is an online video game and game platform designed, developed and published by Epic Games.

381.    Fortnite, first released by Epic Games in 2017, is available to public to play in six distinct game mode versions: *Fortnite: Save the World, Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*.

382.    *Fortnite: Save the World*, released as a paid early access game in 2017 and as a premium game in 2020, is a player-versus-environment, cooperative hybrid tower defense-shooter and survival game in which up to four players collaborate fight off zombie-like creatures and defend objects with traps and fortifications they can build.

383.    In *Fortnite: Save the World*, players work together on missions while fighting off zombie-like creatures and avoiding the effects of an encroaching cataclysmic storm, and, based on the success of the missions, players are awarded a number of in-game items, which includes but is

not limited to hero characters, weapon and trap schematics, and survivor rewards, which can be leveled up through gained experience, to improve gameplay.

384.    *Fortnite Battle Royale,* released in 2017 as a free game supported by microtransactions, is a player-versus-player, battle royale game that a user—playing alone, in a duo, or in a 3-4 player squad—fights against up to 100 other players to be the last person (or team) alive.

385.    In *Fortnite Battle Royale,* after being airdropped weaponless from a "Battle Bus" into the game's map, game players must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players—all while the safe area of the map shrinks down in size due to an incoming toxic storm.

386.    *Fortnite Creative*, released in 2018, is a survival sandbox game mode that allows users to create games such as battle arenas, racecourses, and platforming challenges; gives users complete freedom to "spawn" or create any item from *Fortnite Battle Royale* on a personal island; and supports Unreal Editor for Fortnite so that players can edit worlds using Fortnite assets.

387.    *Lego Fortnite*, released in December 2023 and developed by Epic Games with the Lego Group, is a survival sandbox game that provides game players the opportunity to play as Lego Minifig versions of characters as they collect materials, build various buildings, craft various weapons and tools, and fight monsters.

388.    *Rocket Racing,* released in December 2023 and developed by Epic Games with Psyonix as a spin-off title to *Rocket League*, is a Fortnite game mode that allows players to race vehicles, gaining speed boosts from special lanes sections or by drifting, as well as the ability to jump and racing on vertical and inverted surfaces, while avoiding obstacles on the course.

389. *Fortnite Festival*, released in December 2023 and developed by Epic Games with Harmonix, is a rhythm game in which the user can either play (a) the "Main Stage" hitting notes in a rhythm as either Lead, Guitar/Bass, Drums, or Vocals, or (b) the "Jam Stage" cooperating with other players to make remixes using any part of any song built into the game design.

390. *Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes interface with Fortnite's battle pass system, include microtransactions, and offer new rewards associated with each distinct game mode.

391. All Fortnite game modes, while offering different content, share the same general gameplay design and are powered by the same game engine (Unreal Engine)—all of which have been internally developed and made available by Epic Games.

392. Each Fortnite game mode uses similar graphics, art assets, and game mechanics designed and developed by Epic Games.

393. *Fortnite: Save the World* is a pay-to-play video game product that is available for play on PlayStation 4, Xbox One, and personal computers running macOS or Windows.[19]

394. All other Fortnite versions—*Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*—are free-to-play video game products available for play on all available gaming consoles, including Sony's PlayStation 4 and PlayStation 5, Microsoft's Xbox One and Xbox Series X/S, and Nintendo's Switch.

---

[19] In 2020, due to legal battles between Epic Games and Apple, Inc., the macOS client of *Fortnite: Save the World* remained downloadable and players who had downloaded the game for play using a macOS client could still play then game, however, it would not be updated. Since May of 2022, *Fortnite: Save the World* has been available for play via Xbox Cloud Gaming and GeForce Now on macOS devices.

395. The *Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes also can be played on Android and iOS mobile devices, as well as personal computers running macOS or Windows.[20]

396. *Fortnite Battle Royale,* and the other Fortnite game modes, can be downloaded and played for free through Microsoft's Xbox Cloud Gaming without need for a Xbox Game Pass subscription:



YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS.

[21]

397. Fortnite is also available to download for free on multiple video game platforms with the Epic Games Store app or Valve's Steam app.

398. All Fortnite game modes are cross-platform play compatible, but to use that option, product users are required to have an Epic Games account for cross-saving between platforms.

399. All Fortnite game modes are monetized through the use of V-Bucks, an in-game currency that can be purchased with real-world funds.

---

[20] In 2020, the iOS and Android clients of *Fortnite Battle Royale* were removed by Apple, Inc. and Google, LLC—and became unavailable on certain mobile phones—as a result of legal battles between those companies and Epic Games. The game remained playable if it had already been downloaded on mobile devices running either an iOS or Android client.
[21] https://www.fortnite.com/mobile/xbox-cloud-gaming

400.    In *Fortnite: Save the World,* V-Bucks also can be earned through completing missions and other achievements.

401.    In *Fortnite: Save the World,* V-Bucks can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

402.    In all other Fortnite game modes, including *Fortnite Battle Royale*, V-Bucks can be used to buy cosmetic items like character models.

403.    In *Fortnite Battle Royale,* V-Bucks can be used to purchase a battle pass, which is a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a *Battle Royale* season.

404.    Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

405.    In the first two weeks of the release of *Fortnite Battle Royale*, there were over 10 million people playing the game.

406.    In June of 2018, less than a year after the release of *Fortnite: Save the World, Fortnite Battle Royale,* and *Fortnite Creative*, there were more than 125 million Fortnite players and Epic Games's monthly earnings totaled hundreds of millions of dollars.

407.    From 2017-2019, Fortnite video games had generated over $9 billion in gross revenue through microtransactions and in-game purchases.

408.    In 2021 alone, Fortnite generated $5.8 billion in revenue.

409.    Fortnite has an average of 239 million monthly players, and a potential peak of 15 million players in a day.

410.    Fortnite gained immense popularity because of its clever manipulation of human psychology.

411.    The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

412.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

413.    The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

414.    In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

415.    Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

416.    With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

417.    Additionally, the design of Fortnite purposefully keeps players drawn in. For instance, the bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

418.    Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more—an intentional design through which Epic Games ensures that Fortnite players never once get bored during gameplay.

419.    To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

420.    Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



22

421.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

---

22 https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

422.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

423.    Upon information and belief, Epic Games has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

424.    Epic Games has failed to disclose the risks of harm purposefully built into its game.

425.    Epic Games does not disclose any of the psychological tactics or addictive features it purposefully includes in Fortnite to any of its users.

426.    Several studies have concluded that Fortnite is more addictive than heroin and other illegal drugs.

427.    Epic Games does not warn the public that its Fortnite game products are addictive and likely to cause brain damage, particularly in minors and neurodivergent individuals, when used as intended.

428.    Epic Games touts its game as "educational" and markets it for use in the classroom, including but not limited to offering "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



23

429.    Engaging—and addicting—children early and in environments such as their classroom serves only to increase Epic Games's revenue through continued play of young users, at the expense of these users' mental and physical health.

430.    Epic Games does not adequately inform users of the inherent risks involved with using and playing any Fortnite video game product.

431.    None of the game modes in the Fortnite game series includes a warning that the game was designed to addict and harm users.

---

23 https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

**PlayStation and PlayStation Network: PlayStation 4**

432.    PlayStation is a video gaming brand, owned and operated by Sony, that consists of PlayStation gaming consoles and handhelds, as well as video games and online video gaming through the PlayStation Network and PlayStation Plus.

433.    Sony designs, develops, manufactures, produces, supplies, and sells PlayStation video game consoles—and markets all Sony video game products—to the consumers across the world, and specifically in Georgia and to Plaintiffs.

434.    Sony has manufactured and released six versions of its PlayStation consoles: PlayStation, PS one, PlayStation 2, PlayStation 3, PlayStation 4, and PlayStation 5.

435.    Sony released the original PlayStation in North America in 1995.

436.    Sony designed and developed PlayStation as part of a partnership or joint venture with Nintendo, with the key design feature being a built-in CD-ROM drive to increase load speeds and provide better graphics, along with other technologies, for more engaging video game play.

437.    Sony released a redesigned version of the original PlayStation, PS one, in 2000, with the primary redesign being the home menu's Graphical User Interface.

438.    Concurrently with the release of PS one, Sony released PlayStation 2 ("PS2").

439.    Sony designed PS2 to be backwards-compatible with most original PlayStation games.

440.    PS2 was designed to be allow users to play select video games online, using a third-party server, using an add-on network adaptor sold by Sony for use with the PS2.

441.    In 2004, Sony released a redesigned PS2 Slimline—the first PlayStation console to include a built-in Ethernet port to allow users to play select video games online without need for a separate adaptor.

442.    In 2005, Sony announced their intent to create and build their own PlayStation server so that its product users could constantly be in touch with the PlayStation World.

443.    Sony launched its PlayStation Network in March of 2006.

444.    Sony released PlayStation 3 ("PS3") in North America in November of 2006, featuring redesigns of the hardware and software components including but not limited to the introduction of motion-sensing technology through its wireless controller, a Blu-Ray Disc player, and high-definition resolution.

445.    In marketing PS3 to consumers, Sony used the tagline "Never Stop Playing."

446.    Sony released its PlayStation 4 ("PS4") in North America in November 2013.

447.    Sony marketed PS4 as "pushing the boundaries of Play."

448.    PS4 is not compatible with any video game discs used with older PlayStation consoles, such that PS4 users must purchase new games in order to use PS4.

449.    Sony, and its partner video game designers and developers, distribute and sell PS4 games at retail stores on Blue-Ray Disc, and digitally as downloads through the PlayStation Store.

450.    All PS4 games must be installed to the console's storage.

451.    PS4 has a built-in "PlayGo" feature that allows users to begin to play portions of a game (such as opening levels) once the installation or download reaches a specific point, while the remainder of the game is downloaded or installed in the background.

452.    When a user has connected their PS4 to the internet, Sony and its partner game designers and developers automatically update games and system software in the background and while the console is on standby.

453.    PS4 gaming consoles feature Wi-Fi and Ethernet connectivity, Bluetooth, and other built-in technologies that make game play more interactive and immersive.

454.    In designing and developing the PS4, Sony focused on social interaction capabilities and integration with other devices and video game products, including the ability to play games off-console on PlayStation Vita (a handheld game console) and other supported devices through (known as "Remote Play"), and the ability to stream gameplay online or to friends with them controlling game play remotely (known as "Share Play").

455.    PS4 is designed to allow users to not only play video games with and against one another, but also includes a live streaming feature.

456.    Live streaming allows users to watch live gameplay of other users through the PS4 interface with cross-game camera and microphone input, to spectate silently (i.e., without camera or voice input), or to broadcast their own gameplay live via DailyMotion, Twitch, Ustream, Niconico, or YouTube Gaming, during which friends or members of the public can view and comment upon the user's game play from any device.

457.    In releasing PS4, Sony also redesigned the game controller to make it easier for users to utilize these features and engage in social gameplay.

458.    In designing PS4, Sony used technology similar to personal computers to make it easier and less expensive for game studios, including its own, to develop video games for PS4.

459.    Sony sells and markets add-on video game products for use with PS4, including PlayStation VR and PlayStation Camera, as a means for consumers to further utilize the built-in social gaming features and to enhance their video gaming experience.

460.    Sony also released the PlayStation App in conjunction with the PS4, which allows PS4 owners to turn a smartphone or tablet into a second screen to enhance gameplay.

461.    In 2015, Sony released PlayStation Now, a cloud-based video game distribution product that allows users to purchase PS3 games (individually or by subscription) for play on the PS4.

462.    Sony released its PlayStation 5 ("PS5") worldwide on November 12, 2020.

463.    PS5 was designed to provide users with fast loading times and a larger bandwidth to make games more immersive and to support all features (including microtransaction) built into video games.

464.    PS5 was also designed with a completely new user interface, but is backwards compatible with most PS4 and PlayStation VR games.

465.    PS5's main hardware features include a solid-state drive, customized for high-speed data streaming to enable significant improvements in storage performance, an AMD GPU capable of 4K resolution display, hardware-accelerated ray tracing for realistic lighting and reflections, the Tempest Engine for hardware-accelerated 3D audio effects, a DualSense controller with haptic feedback, and other upgraded features that make game play more interactive and immersive.

466.    PS5 is available in two models: a base version with an Ultra HD Blu-Ray compatible optical disc drive for retail game support alongside online distribution via the PlayStation Store, and a lower-cost variant lacking the disc drive and retaining digital download support.

467.    Like PS4, users are required to install all video games on the PS5 console in order to play the game.

468.    In marketing PS5 and its features, including the DualSense controller, Sony told consumers "you need new devices to experience what these developers want you to experience."

469.     For use with its PlayStation consoles and games, Sony designed, developed, and maintains the PlayStation Network.

470.     PlayStation Network allows users to participate in online multiplayer gaming and to purchase video games and other video game products through the PlayStation Store.

471.     Sony developed and maintains the PlayStation Store—a product through which users can purchase and download thousands of games:



24

472.     Fortnite is available through the PlayStation Store.

473.     Once a game is downloaded, Sony provides a framework to initiate and process in-game purchases and microtransactions through the PlayStation Store.

474.     This framework enables game developers to sell microtransactions and/or loot boxes through the PlayStation Network.

475.     In exchange, Sony keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

---

24 https://store.playstation.com/en-us/pages/browse

476.     Another product Sony makes available on its PlayStation Network is PlayStation Plus ("PS Plus"), a paid tiered subscription service offered by Sony that provides users access to online multiplayer games.

477.     PlayStation Plus offers three membership plans, each with different features and costs.

478.     The "Essential" tier offers users monthly downloads of PlayStation games as well as the ability to play online multiplayer games, for $9.99 per month.

479.     The "Extra" tier offers the same features as the Essential tier, but with access to the PlayStation Game Catalog of hundreds of games.

480.     Finally, the "Premium" tier provides the same features as the Essential and Extra tiers, but also provides access to the Classics Catalog and cloud streaming.

481.     PlayStation cloud streaming allows users to stream and play hundreds of PS5, PS4, and classic PlayStation games from any PS5 or PS4 console or computer.

482.     Through PlayStation cloud streaming, downloadable video game products, and in-game purchases are available for streaming—meaning that purchased products will be available on every device on which a user logs in to play.

483.     PlayStation Plus cloud gaming operates by linking the devices to a remote server in the cloud.

484.     Gameplay is saved in the cloud and can be accessed and picked up at the same spot from numerous devices in any given location.

485.     As of March 2023, PlayStation Plus had over 47 million subscribers.

486.     These subscribers are able to connect, add each other as friends, and chat through the PlayStation Network.

487.     This social media-esque feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game.

488.     Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games

489.     Sony's latest tagline—"Play Has No Limits"—encourages users across the world, no matter their circumstances, to engage in limitless video game play.



490.     Sony intentionally designed its video game products, described above, to attract users to purchase and play video games—regardless of the content or subject matter such games may include.

491.     Upon information and belief, Sony hires behavioral psychologists and neuroscientists to design its consoles, games, products, and marketing in such a way to attract users, especially minors and young adults, and to keep them playing.

---

[25] https://www.youtube.com/watch?v=cAEs3hI1f2w

492.    Sony is aware that its video game products and the games playable thereon, that it sells and encourages users to continually purchase in-game product upgrades and microtransactions are addictive and pose unreasonable risk of harm to users, particularly minors.

493.    Sony does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon—were designed to addict and harm users.

**PUBG Mobile**

494.    PUBG: Battlegrounds is a battle royale game inspired by the Japanese film, *Battle Royale*.

495.    The game was first released in 2017 and versions supported by different platforms have been released in 2018 and 2020.

496.    Since January 12, 2022, PUBG: Battlegrounds has been free to play.

497.    PUBG is the developer of the game, and Krafton Tencent are the publisher (collectively the "PUBG: Battlegrounds Defendants").

498.    PUBG: Battlegrounds has approximately 30 million daily players.

499.    By June 2023, PUBG: Battlegrounds had generated over $10 billion in revenue.

500.    PUBG: Battlegrounds has been credited with popularizing the battle royale game genre.

501.    PUBG: Battlegrounds presents gameplay that is easily approachable by players of any skill level.

502.    The game is a player versus player shooter game, in which up to 100 players fight in a battle royale match, each trying to remain the last alive.

503.    Players can enter a match solo, or in groups of up to four people.

504.     Each match starts with players parachuting from a plane onto one of eight maps, each having different sizes and terrains.  The plane's flight path across the map varies with each round.

505.     Players start with no gear beyond customized clothing selections; once they land, they must search the game map for weapons, vehicles, armor, and other equipment.  These items are procedurally distributed throughout the map at the start of a match.

506.     During gameplay, a plane will fly over various parts of the map at random and drop a loot package containing items which are normally unobtainable during normal gameplay.

507.     At the completion of each round, players earn in-game currency based on their performance.

508.     In-game currency can be used to purchase loot crates which contain cosmetic items, or "skins," for character or weapon customization.

509.     Players can also purchase this in-game currency with real-world money.



510.    In addition, PUBG: Battlegrounds offers a "Battlegrounds Plus" package, allowing

players to obtain in-game currency along with certain benefits and skins.

---

26 https://support.pubg.com/hc/en-us/articles/900003190826-What-is-G-COIN-
#:~:text=G%2DCOIN%20can%20be%20purchased,the%20%5BPurchase%20Item%5D%20win
dow.&text=%E2%91%A1%20Purchase%20item%20%3E%20Click%20on,%2DCOIN%22%20
button%20%3E%20Purchase.



27

511.  PUBG: Battlegrounds also gives rewards to players that login each day, encouraging continued play daily.

---

27 https://pubg.com/en/game-info/pubg-plus



Make your day a little bit better: Log into the game, loot some great items and become one step closer to creating an awesome look for your character. And while you are at it, enjoy the thrilling action PUBG: BATTLEGROUNDS has to offer!

**Event Missions & Rewards**

Daily Login Rewards:

- Day 1: Supply Loot Cache x1
- Day 2: Contraband Coupon x2
- Day 3: Supply Loot Cache x1
- Day 4: Contraband Coupon x3
- Day 5: Hunter's Chest x1
- Day 6: Supply Loot Cache x1
- Day 7: Contraband Coupon x5
- Day 8: Supply Loot Cache x1
- Day 9: BP x5000
- Day 10: Contraband Coupon x10

[28]

512.     Additionally, a player's rank increases when they consistently play the game; but the higher a player's rank, the more points they lose if they perform poorly in a match.  Thus, playing more and enhancing your skills in the game is rewarded, whereas performing poorly requires more matches played to make up for a loss in points.

513.     PUBG: Battlegrounds utilizes matchmaking algorithms to ensure players battle others with similar skill levels.

---

[28] https://pubg.com/en/events/notice/6364

514.    Such matchmaking ensure that players' win percentages stay high, and the game is adequately challenging—never too easy or too difficult.

515.    In combination, these addictive tactics, including varied gameplay, daily freebies, various cosmetic items to earn or purchase, and rank determined by amount of play, keeps players interested and invested in the game.

516.    The PUBG: Battlegrounds Defendants were aware that PUBG: Battlegrounds included significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors.

517.    PUBG: Battlegrounds has been banned in numerous countries, including India, Nepal, Iraq, and Pakistan, because of its addictive properties and its negative impacts on physical and psychological health of children.

518.    One extreme example of the negative effects of addiction arose in Mumbai, India, where a teenager committed suicide after arguing with his family about purchasing a high-end smartphone just to play PUBG: Battlegrounds.  After the youth's family refused to give into his demands, the teen—feeling distraught and frustrated as a result of his addiction—drastically took his own life.

519.    Upon information and belief, the PUBG: Battlegrounds Defendants specifically designed the PUBG: Battlegrounds games in concert with psychologists and neuroscientists to discover the best addictive aspects to include in their games.

520.    Upon information and belief, the PUBG: Battlegrounds Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the PUBG: Battlegrounds games.

521.    Though the PUBG: Battlegrounds Defendants know of the addictive features and technology included in their games, they do not inform their users of the risks inherent with playing this game.

522.    The PUBG: Battlegrounds Defendants do not adequately inform users of the inherent risks involved with using and playing PUBG: Battlegrounds or that the game was designed to addict and harm users.

## **Dell Computer**

523.    Dell is a technology company that develops, sells, repairs, and supports computers and related products and services. Dell is a wholly-owned subsidiary of Dell Tech (collectively with Dell, the "Dell Defendants").

524.    The Dell Defendants produced the first computer of its own design in 1985, and by 2024, Dell Technologies has grown to be worth over $84 billion.

525.    Dell personal computers ("PC") are often conduits for gamers to access and play addictive video games, and the design of these computers only serves to encourage such gaming.

526.    In fact, Dell acquired Alienware, a manufacturer of high-end PCs for gamers, in 2006, and released the first Alienware/Dell branded system in 2009. Dell continues to design, manufacture, and sell such gaming PCs today.



# Alienware Gaming Laptops

**Immersive Gaming Experiences |
Starting at $1,199.99**

Experience high-performance gaming with iconic designs and intelligently engineered laptops.

[ Shop Alienware ]   [ Explore Alienware ]

29

527.    While Dell manufactures and sells gaming laptops, users are still more than capable of becoming addicted to games with typical, non-gaming PCs as well.

528.    Dell computers allow for the download and installation of several addictive video gaming materials. In fact, some versions of Dell computers come preinstalled with video games for users to easily access and play in excess.

529.    Microsoft is one such game downloadable to a Dell computer.

530.    Regardless of the type of PC, Dell products are designed with weak parental controls, allowing children extended access to numerous applications and sites that parents and guardians would otherwise limit or ban entirely.

531.    In addition, even schools that purchase Dell computers for students are unable to completely control students' gaming capabilities on Dell devices. Students are able to bypass certain controls and access gaming applications and websites not only at home but during school hours as well.

---

[29] https://www.dell.com/en-us/shop/gaming-laptops-pcs-and-accessories/sc/game

532.   As a result, users—particularly minors and young adults—are able to develop, or feed, a gaming addiction by easily bypassing any of the so-called "controls" on their Dell computers.

533.   This is part of the Dell Defendants' efforts to increase users' access to games in order to "support the [gaming] industry's growth."

| Dell Blog ⌄ |
|---|
| Yes, gaming has gone far beyond the basement, and Dell is ready to support the industry's growth in many ways. From delivering the hardware needed to create the games, to the PCs on which you play them, to sponsorship of eSports leagues and professional gamers that bring the gameplay to even larger audiences. |

[30]

534.   The Dell Defendants do not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon—were designed to addict and harm users.

535.   Instead, the Dell Defendants specifically designed Dell PCs to attract users to purchase PCs in order to download and install games and in-game content therein, without limitation—regardless of the harmful content such games may include.

536.   Upon information and belief, the Dell Defendants hire behavioral psychologists and neuroscientists to design their products and marketing in the best way possible to attract users, especially minors and young adults.

537.   The Dell Defendants are aware that the lack of controls and the ability to download and install numerous games via Dell PCs pose unreasonable risk of harm to users, particularly minors, as a result of addiction.

---

[30] Pevehouse, Laura, *Why and How Dell Supports Gaming*, DELL BLOG (Jan. 19, 2017), https://www.dell.com/en-us/blog/why-and-how-dell-supports-gaming/.

**Apple App Store**

538.     Through the Apple App Store, Apple provides a method for users to download certain games and play them on iPhones, iPads, and other Apple products.

539.     Roblox is available in the Apple App Store.

540.     Once a gaming app is downloaded, Apple provides a framework for "in-app billing" to initiate and process transactions.

541.     This framework enables game developers to sell microtransactions and/or loot boxes through Apple.

542.     In exchange, Apple takes 30% of all revenue generated by these microtransactions and in-app purchases.

543.     Apple does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon—were designed to addict and harm users.

544.     Instead, Apple specifically designed the App Store to attract users to purchase games and in-game content therein—regardless of the harmful content such games may include.

545.     Apple hires behavioral psychologists and neuroscientists to design its products and marketing in the best way possible to attract users, especially minors and young adults.

546.     Apple is aware that several of the games on the App Store that it sells and encourages users to purchase continuous in-game content are addictive and pose unreasonable risk of harm to users, particularly minors.

**N.  S.B.'s Access to Defendants' Products**

547.     Defendants market their gaming products, including, Minecraft and Roblox, and their respective subscription services and in-game transactions, to minors.

548.     S.B. is such a minor to whom Defendants directed their marketing efforts and to

whom Defendants sold their gaming products.

549.    S.B.—as a minor—lacked the capacity to contract, and thus Plaintiffs expressly disaffirm any contract S.B. may have made with any of the Defendants, or that Defendants may claim S.B. made with them before reaching the age of majority.

550.    S.B.'s continued use of Defendants' products is compulsive and due to addiction and in no way was an affirmation of any contract.

551.    After consumers purchase Defendants' gaming products, Defendants condition users' access to their gaming products on accepting terms and conditions—and failure by users to accept and to continue to accept any new terms and conditions results in a loss of access to the purchased product. Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

552.    Defendants' products were designed to addict S.B. to the products, which proximately caused S.B.'s mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a minor.

**V.    TOLLING OF STATUTE OF LIMITATIONS**

553.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

554.    Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

555.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

556.    Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

557.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

558.    Defendants' fraudulent concealment has tolled the running of any statute of limitations.

559.    Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

560.    Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

561.    Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

562.    Despite their knowledge of the defects and attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

563.    Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

564.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
### (Against all Defendants)

565.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

566.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

567.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

568.    Each of the Defendant's respective products are marketed and advertised to minors and young adults.

569.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to design a safe product.

570.    Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

a. The Minecraft Defendants designed Minecraft to include addictive psychological traits, including but not limited to a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects, and for Minecraft to be used with laptops such as the Dell laptop used by S.B.;

b. Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

c. InnerSloth designed Among Us with psychologically addictive features, including but not limited to addictive feedback loops, fast-paced play, satisfying graphics and sounds, and other dopamine lifts.

d. The Subway Surfers Defendants designed Subway Surfers with psychologically addictive features, including but not limited to a never-ending level because the player character runs for an infinite amount of time while avoiding obstacles with the guideline of completing "Daily Challenges" and "Season Hunts". Subway Surfers contains addictive feedback loops that are reinforced with coins, keys, in-game purchases, collecting specific in-game items, and the dopamine releasing feedback of connecting to a Facebook account.

e. Epic Games designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including but not limited to, designing the game to include a "near miss" effect, loot

boxes, random rewards, bright and vibrant colors, and continual gameplay variety;

f.   Sony designed its PlayStation consoles including PlayStation 4 with addictive features and for use with addictive video game products, and designed its PlayStation Network, including the PlayStation 4 used by S.B., with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to engaging graphics, social aspects, and rotating game libraries;

g.   PUBG Defendants designed PUBG Mobile to be as addictive as possible and includes various addictive tactics, including but not limited to varied gameplay, daily freebies, various cosmetic items to earn or purchase, and rank determined by amount of play;

h.   Dell and Dell Tech designed personal computers used for video gaming with psychologically addictive features, including but not limited to lack of or weak parental or school controls to limit gaming access; and

i.   Apple designed the Apple App Store with psychologically addictive properties and technologies to encourage users to make purchases through the App Store.

571.   The defects in the design of each of the Defendant's respective products existed prior to the release of these products to S.B. and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to S.B. via download or URL access (in regard to digital game copies and cloud gaming).

572.   S.B. used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that S.B. would use these products without Plaintiffs inspecting them for their addictive nature.

573.   Each Defendant designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

    a.   The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists to ensure the addiction of minors and neurodivergent users.;

    b.   Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

    c.   InnerSloth designed Among Us in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

    d.   The Subway Surfer Defendants designed Subway Surfers in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

    e.   Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

    f.   Sony designed its PlayStation consoles including PlayStation 4 and its PlayStation Network, including the PlayStation Online products and

subscriptions used in shared play by S.B. on his neighbor's PlayStation 4, in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minors and young adult users continually use its video game products and continually purchase addictive video game products for play on PlayStation consoles;

g.   PUBG Defendants designed PUBG Mobile in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

h.   Dell and Dell Tech designed personal computers used for video gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals; and

i.   Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

574.   Each of the Defendant's respective products are defective in design and unreasonably dangerous for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

575.   Youth, including S.B. and young adults are among the ordinary consumers of each of the Defendant's products.

576.   Minors and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are

used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

577.    Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of brain damage, abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

578.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including S.B. who used the products without any substantial change in the products' condition.

579.    The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

580.    Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

a.    Choosing not to use "addictive" patents identified herein in the game design;

b.    Redesigning gaming software to limit rather than promote addictive engagement;

c.  Implementing robust age verification;

d.  Implementing effective parental controls;

e.  Implementing effective parental notifications;

f.  Warning of health effects of use and extended use upon sign-up or log-in;

g.  Implementing default protective limits to the length and frequency of gaming sessions;

h.  Implementing opt-in restrictions to the length and frequency of gaming sessions;

i.  Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j.  Implementing blocks to use during certain times of day (such as during school hours or late at night);

k.  Implementing limits on number of games playable per day;

l.  Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.  Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n.  Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.  Others as set forth herein.

581.  Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have

effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

582. S.B. used Defendants' products as intended or in reasonably foreseeable ways.

583. As a direct and proximate result of their use of Defendants' defectively designed products, S.B. sustained physical and mental injuries, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

584. S.B.'s injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution, especially considering each of the Defendant's conduct—described herein—of specifically designing their respect products to be addictive.

585. The defective design of the products used by S.B. was a substantial factor in causing harm to S.B.

586. As a direct and proximate result of Defendants' respective products' defective design, S.B. sustained brain damage, became addicted to video games, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain and suffering, and mental anguish.

587. S.B. was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

588. The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to S.B..

589. Plaintiffs' damages proximately caused by Defendants' defective design are S.B.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish;

S.B.'s inability to attend school; economic loss related to expenses incurred because of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to S.B.'s physical and mental injuries. S.B.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

590.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

591.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

592.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, S.B. continues to use Defendants' respective products. While S.B. uses Defendants' respective products, Plaintiffs will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

593.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

594.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

595.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

596.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

597.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

598.     Defendants owed a duty to all reasonably foreseeable end-users/consumers to disclose the known risks associated with the use of their products.

599.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

600.    Each of the Defendants sold and distributed its respective products to S.B. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

601.     Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

602.     Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution and their respective propensities for abuse, addiction, and compulsive use by youth which can lead to a cascade of harms.

603.     Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

    a.   Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

    b.   Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

    c.   The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming content to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

    d.   New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a

safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.  The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.  The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

604.  Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

605.  Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

606.  Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

607.  As a direct and proximate result of each Defendant's failure to warn, S.B. has required and will require more healthcare and services and did incur medical, health, related expenses incidental to S.B.'s addiction and mental disability, as described herein.

608.  Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

609.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

610.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, S.B. continues to use Defendants' respective products. When S.B. uses Defendants' respective products, Plaintiffs will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

611.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including S.B. and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## STRICT LIABILITY – FAILURE TO INSTRUCT
### (Pleaded in the Alternative)
### (Against All Defendants)

612.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

613.    Plaintiffs plead this claim in the alternative.

614.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

615.   Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

616.   Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

617.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to provide adequate instructions on how to use their products safely and without resulting harm.

618.   Each of the Defendants sold and distributed its respective products to S.B. in a defective and unreasonably dangerous condition by failing to provide reasonable and adequate instructions with respect to the conditions and methods of the product's safe use when a risk of abuse, addiction, and compulsive use by youth was reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

619.   Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

620.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

       a.   The Minecraft Defendants designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited

to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. InnerSloth defectively designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Subway Surfers Defendants defectively designed Subway Surfers to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  Epic Games designed Fortnite with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Sony designed its PlayStation consoles with addictive features and for use with addictive video game products, designed its PlayStation Network, including PlayStation Online Products/Subscriptions used by S.B., e.g. PlayStation Store and PlayStation Plus, with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  PUBG Defendants designed PUBG Mobile with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.  Dell and Dell Tech defectively designed personal computers used for video gaming to take advantage of the chemical reward system of a user's brain

(especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

i.   Apple designed the Apple App Store as a to house addictive gaming products and pushed users to make purchases through the App Store, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

621.   Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to S.B.

622.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

623.   Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to instruct users

with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendant's respective products.

624.    Ordinary users would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to each of the Defendants.

625.    A reasonable company under the same or similar circumstances as each of the Defendants would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

626.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

627.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have followed such instructions.

628.    Each Defendant's failure to adequately instruct Plaintiffs regarding the risks of each of the Defendant's respective products and the need to alter S.B.'s game play to avoid such risks was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

629.    As a direct and proximate result of each Defendant's failure to instruct, S.B. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

630.    Defendants are strictly liable due to each Defendant's failure to instruct regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, as described herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

631.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such

remedies at law are inadequate.

632.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conduct in making their games addictive, S.B. continues to use Defendants' respective products. When S.B. uses Defendants' respective products, Plaintiffs will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

633.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including S.B. and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT IV
## NEGLIGENCE – DESIGN
### (Against All Defendants)

634.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

635.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

636.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

637.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

638.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to design a safe product.

639.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. More specifically:

    a.  The Minecraft Defendants designed Minecraft with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b.  Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c.  InnerSloth designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create

addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  The Subway Surfer Defendants designed Subway Surfers to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Sony Interactive Entertainment designed PlayStation with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior,

withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  PUBG Defendants designed PUBG Mobile with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.  Dell and Dell Tech designed personal computers used for video gaming to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

i.  Apple designed the Apple App Store to house addictive gaming products and pushed users to make purchases through the App Store, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

640.  Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and

distribution to S.B. especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

641.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects. Despite this knowledge, each Defendant failed to warn users, including S.B. of their respective product's dangerous propensity.

642.   Each Defendant knew that minors such as S.B. would use its respective products.

643.   S.B. was a foreseeable user of each of the Defendant's respective products.

644.   Each Defendant had a non-delegable duty to design reasonably safe products.

645.   Each Defendant owed this duty to users including S.B.

646.   Each Defendant breached this duty. These breaches include, but are not limited to:

    a.   Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

    b.   Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

    c.   Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

    d.   Failing to use ordinary care in the design of its products by negligently

designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

f.  Otherwise failing to use ordinary care in its design.

647.    Alternative designs that would reduce the addictive features of each of the Defendant's respective products were available, would have effectively served the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger each of the Defendant's respective products posed minors such as Plaintiff.

648.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

649.    At all relevant times, S.B. used each of the Defendant's respective products in the way they were intended by Defendants to be used.

650.    As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed.

651.    Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

652.    As a direct and proximate result of each of the Defendant's breached duties, S.B.

has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses related to the S.B.'s gaming addiction, physical injuries, mental health diagnoses, emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product.

653.    As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continued to suffer—economic loss and pecuniary damages, as described herein, related to the S.B.'s gaming addiction, mental health diagnoses, emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product.

654.    Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

### COUNT V
### NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

655.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

656.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

657.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

658.    Each of the Defendant's respective products are also marketed and advertised to

minors and young adults.

659.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to disclose the known risks associated with the use of their products.

660.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner. More specifically:

  a.    The Minecraft Defendants designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

  b.    Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

  c.    InnerSloth designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive

use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.   The Subway Surfer Defendants designed Subway Surfers to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.   Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain in order to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.   Sony designed its PlayStation consoles including PlayStation 4, with addictive features and for use with addictive video game products, designed its PlayStation Network, including PlayStation Online Products/Subscriptions used by S.B., e.g. PlayStation Store and PlayStation Plus, with addictive features to be used with its PlayStation consoles and to house, purchase, and

use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.   PUBG Defendants designed PUBG Mobile with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.   Dell and Dell Tech designed personal computers used for video gaming to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

i.   Apple designed the Apple App Store to house addictive gaming products and pushed users to make purchases through the App Store, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

661.   Each Defendant knew or, by the exercise of reasonable care, should have known

that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to S.B. especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

662.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as S.B. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

663.    Each Defendant knew that minors such as S.B. would use its respective products.

664.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

665.    Had Plaintiffs received proper or adequate warnings about the risks of Defendants' products, Plaintiffs would have heeded such warnings.

666.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

667.    Each Defendant owed this duty to users including S.B..

668.    Each Defendant breached this duty owed to S.B. a foreseeable user. These breaches include, but are not limited to:

a. Failing to warn users that Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

b. Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

669.   A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

670.   At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

671.   Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, S.B. and S.B.'s parent would have heeded such warnings.

672.   As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein.

673.   Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

674.   Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## NEGLIGENCE – FAILURE TO INSTRUCT
### (Against All Defendants)
### (Pleaded in the Alternative)

-123-

675.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

676.    Plaintiffs plead this Count in the alternative.

677.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

678.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

679.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

680.    Defendants owed a duty to all reasonably foreseeable end-users/consumers to provide adequate instructions on how to use their products safely and without resulting harm.

681.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

        a.    The Minecraft Defendants designed Minecraft to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. InnerSloth designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. The Subway Surfer Defendants designed Subway Surfers to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. Epic Games designed Fortnite to take advantage of the chemical reward system of a product user's brain to create addictive engagement, while knowing that

abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.   Sony designed its PlayStation consoles, including PlayStation 4, with addictive features and for use with addictive video game products, designed its PlayStation Network, including PlayStation Online Products/Subscriptions used by S.B., e.g. PlayStation Store and PlayStation Plus, with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.   PUBG Defendants designed PUBG Mobile with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.   Dell and Dell Tech designed personal computers used for video gaming to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can

lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

i. Apple designed the Apple App Store to house addictive gaming products and pushed users to make purchases through the App Store, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

682. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to S.B..

683. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

684. Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use unless the danger is known to the user or is reasonably discoverable by them.

685.   Each Defendant breached its duty by failing to provide reasonable and adequate instructions to S.B. a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendants' respective gaming products.

686.   A reasonable company under the same or similar circumstances as Defendants would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

687.   At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

688.   Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, S.B. and S.B.'s parent would have followed such instructions.

689.   As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Plaintiffs.

690.   As a direct and proximate result of each Defendant's failure to instruct, S.B. has required—and will require more—healthcare and services, along with incurring—and continuing to incur—medical, health, incidental, and related expenses.

691.   Plaintiffs have also incurred economic losses, including thousands of dollars spent by S.B. while using Defendants' products, that they would not have incurred but for the addictive and harmful propensities of Defendants' gaming products.

692.   Each Defendant negligently failed to instruct consumers, including Plaintiffs, of the

risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## NEGLIGENCE PER SE
### (Against All Defendants)

693.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

694.    The United States Congress has enacted the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, to protect minors who use the Internet.

695.    Federal regulations, specifically 16 C.F.R. § 312 *et seq.*, have been put in place to effectuate COPPA's purposes and which establish certain obligations for operators of websites and online services that are intended to inform parents and guardians about the collection of their children's personal information.

696.    COPPA requires operators of online services and websites directed to children under 13 to notify parents about the personal information they collect and to obtain verifiable parental consent before collecting and using any personal information collected from children. 16 C.F.R. § 312.4(a).

697.    The parental notice required by COPPA "must be clearly and understandably written, complete, and must contain no unrelated, confusing, or contradictory materials." 16 C.F.R. § 312.4(a).

698.    COPPA requires operators to make reasonable efforts to ensure that a parent of a child receives direct notice of the operator's practices with regard to the collection, use, or disclosure of personal information from children before collecting personal information from

children. 16 C.F.R. § 312.4(b).

699.     COPPA requires operators of online services and websites to collect a child's telephone number, as opposed to online contact information, without first obtaining verifiable parental consent. 16 C.F.R. § 312.5(c)(1) and (6).

700.     COPPA requires operators to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that each Defendant collects personal information from children. 16 C.F.R. § 312.4(d).

701.     A violation of COPPA, including the regulations enacted to enforce that law, constitutes an unfair or deceptive act or practice in or affecting commerce. *See* 15 U.S.C. § 6502(c); 15 U.S.C. § 45(a)(1).

702.     Avatars generated from a child's image, and biometric and health information, are covered by COPPA when collected with other personal data.

703.     Each Defendant is an "operator" as defined by 16 C.F.R. § 312.2 and, therefore, subject to the laws and regulations established by COPPA.

704.     Each of the Defendants collects or uses personal information from children under the age of 13—including S.B.—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

705.     Each Defendant has actual knowledge that it collects personal information directly from users of its respective websites or online services.

706.     Each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

      a.   Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents that described each

Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b. Failing to make reasonable efforts, taking into account available technology, to ensure parents received such notice on their websites and applications so that parents could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c. Failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

d. Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like S.B.) into making unintentional purchases;

e. Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

f. Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

707. The Minecraft Defendants, in connection with Minecraft, violated COPPA and those violations include, but are not limited to:

a. Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent;

b. Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c. Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

    i. Collecting personal information, from the child in violation of COPPA and then suggesting that the child seek parental involvement—this limited notice of the Minecraft Defendants information practices failed to ensure parents received adequate notice about the Minecraft Defendants' collection, use, and disclosure practices concerning children's personal information;

    ii. Failing to include the information required by 16 C.F.R. § 312.4(b);

    iii. Failing in the direct notice to describe the Minecraft Defendants' collection and use practices regarding personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); and

    iv. Not disclosing in the direct notice to parents that the Minecraft Defendants intended to collect such personal information as images that could contain a child's likeness;

d. Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that the Minecraft Defendants collect personal information from children;

e. Failing to include a complete Privacy Statement was incomplete. More specifically, until at least 2019, the Minecraft Defendants' Privacy Statement

contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or the Minecraft Defendants' use and disclosure practices for personal information collected from children as required---and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

708.    The Minecraft Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

709.    Roblox Corp., in connection with its Roblox online game platform and game creation system, violated COPPA and those violations include, but are not limited to:

    a.  Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

    b.  Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily;

    c.  Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

     d.  Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

710.    Roblox Corp.'s COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

711.    InnerSloth in connection with Among Us, violated COPPA and those violations include, but are not limited to:

     a.  Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, usage information, profile inferences, in-game communications, and precise location;

     b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

     c.  Collecting and maintaining biometric material, including photographs, audio recordings, movement information, eye tracking, and video footage;

     d.  Automatically collecting minors' information through tracking technologies;

     e.  Sharing minors' information with third parties and business partners; and

     f.  Utilizing a deficient post-collection notice and verifiable parental consent process;

712.     InnerSloth's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

713.     Subway Surfer Defendants COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

714.     Epic Games, in connection with its Fortnite video game product, violated COPPA and those violations include, but are not limited to:

    a.  Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like S.B.) into making unintentional purchases in its Fortnite game;

    b.  Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

    c.  Collecting personal data from children, including S.B., without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite;

    d.  Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e.  Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens— and violate COPPA because these default settings, along with Epic Games's role in matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f.  Tricking users, including minors like S.B., into making purchases while playing Fortnite. More specifically, Epic Games has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g.  Charging account holders, including Plaintiffs, without authorization and allowed minors, including S.B., to purchase in-game content without parental consent;

h.  Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic Games

agreed to unlock an account, consumers were warned that they could be banned

for life if they disputed any future charges; and

i. Purposefully obscuring cancel and refund features to make them more difficult

to find.

715. Epic Games's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

716. Sony, in connection with its PlayStation game consoles and PlayStation Network, including but not limited to its PlayStation 4, violated COPPA and those violations include, but are not limited to:

a. Collecting personal information from children who signed up to its PlayStation

Network, PS Plus, PlayStation Store, and any other product within the

PlayStation group without notifying their parents or obtaining their parents'

consent, and by illegally retaining children's personal information;

b. Allowing children, after creating an account on PlayStation, to create a profile

that will include their "PSN"—a unique online ID—and allowing them to

upload a picture or include an avatar, which is a figure or image that represents

the user. Sony then combines this information with the information Sony

collects and links to each user, including the games played, products owned,

and actions taken while on a PlayStation device and/or network;

c. Utilizing third parties to collect personal information and activity from minors

without parental consent;

d.  Sharing personal information of minors with third parties, including service providers, game publishers, and Sony business partners;

e.  Requiring users or parents to take additional steps to opt out if they do not want unnecessary data collected; and

f.  Using the data collected on minor children less than 13 years old to use a patented system of analyzing gamer behavior, tracking kids with their respective PSN ID, and using a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or IGD.

717.    Sony's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors—including S.B.—and to design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

718.    Dell and Dell Tech, in connection with Dell personal computers, violated COPPA and those violations include, but are not limited to:

a.  Collecting and maintaining personal information from minors without parental consent;

b.  Automatically collecting minors' information through tracking technologies;

c.  Sharing minors' information with third parties and business partners; and

d.  Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to, collecting personal information, from the

child in violation of COPPA, and then suggesting that parents concerned with the collection of their children's information should contact them via their website.

719.   Dell and Dell Tech's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

720.   Apple, in connection with the Apple App Store, violated COPPA and those violations include, but are not limited to:

    a.   Employing dark patterns in children's gaming apps, including Roblox, such as, tricking someone into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges;

    b.   Using dark patterns to entice minors, including S.B., into microtransactions without parental consent or consent of the account holder, including but not limited to attracting and enticing minors into microtransactions based on the minor-player's gaming behavior and their personal data (e.g., IP addresses, geolocation, voice) that is illegally collected, not deleted, or gained through passive tracking applications; and .

    c.   Collecting and retaining children's voice and audio information.

721.   Apple's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and

design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

71.     Defendants have violated statutory law, as identified above, and with each violation, each Defendant proximately caused injury and damage to Plaintiffs. This damage includes the injuries and harms to Plaintiffs described above, including but not limited to S.B.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's statutory violations, S.B. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

722.     Plaintiffs are within the class of persons that COPPA is intended to protect—and Plaintiffs' injuries and damages are the type of harm that these statutes and regulations are intended to prevent—therefore, each Defendant is *per se* negligent for violating COPPA.

**COUNT VIII**
**NEGLIGENCE – ORDINARY**
**(Against All Defendants)**

723.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

724.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

725.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

726.    Each of the Defendant's respective products are also marketed and advertised to young adults and minors, including S.B..

727.    Each Defendant owed S.B. a duty to act as a reasonably careful company would under the circumstances.

728.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

729.    A reasonably careful company would protect S.B. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

730.    A reasonably careful company would not invite, encourage, or facilitate youth, including S.B. to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

731.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

    a.   The Minecraft Defendants failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm;

b. Roblox Corp. failed to disclose it designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. InnerSloth failed to disclose that it designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

d. The Subway Surfer Defendants failed to disclose that it designed Subway Surfers to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

e. Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to take advantage of the chemical reward system of a user's

brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

f.   Sony Interactive Entertainment failed to disclose that it designed the Fortnite games with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

g.   PUBG Defendants failed to disclose that it designed the PUBG Mobile games with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

h.   Dell and Dell Tech failed to disclose that they designed personal computers used for video gaming to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain

damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm; and

i.   Apple failed to disclose that it designed the Apple App Store to house and push addictive content to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

732.   S.B. was a foreseeable user of the Defendants' respective products.

733.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of S.B.'s use of Defendants' respective products.

734.   Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth, including S.B. in a reasonably foreseeable manner. More specifically: each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

735.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including S.B. which risks were known and knowable, including in light of the internal information and

knowledge each Defendant had regarding its products.

736.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, including S.B. would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

737.    Each Defendant's conduct was closely connected to Plaintiffs' injuries and damages, which were highly certain to occur.

738.    Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed S.B..

739.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as each of the Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

740.    Each Defendant also owes a duty to not to engage in unfair or deceptive acts or practices, including but not limited to utilizing deception, fraud, false pretenses, misrepresentation, or concealment in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq*.

741.    Each Defendant also owes a duty not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq*.

742.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions

about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay to avoid such risks.

743.    Each Defendant has breached the duties owed to S.B..

744.    Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

       a.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including S.B.;

       b.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including S.B. including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

       c.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including S.B.;

       d.  Maintaining unreasonably dangerous features and algorithms in their respective

products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including S.B.; and

e.  Facilitating use of their respective products by youth under the age of 13, including S.B. by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

745.   Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.  Failing to implement effective protocols to block users under the age of 13;

b.  Failing to implement effective parental controls;

c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e.  Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.  Failing to implement reasonably available means to set up and operate its

products without features and patented addictive technology, discussed above,

that rely on unreasonably dangerous methods as a means to engage youth users.

746.    Each Defendant further breached the duty owed to Plaintiffs by failing to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

747.    Each Defendant also breached its duty owed to Plaintiffs under Georgia law not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

748.    Each Defendant also breached its duty owed to Plaintiffs under Georgia law not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

749.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users including S.B.; yet Defendants did not do this.

750.    As a direct and proximate result of each Defendant's breach of one or more of its duties, S.B. has been injured and Plaintiffs were harmed. Such injuries and harm include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

751.    Each Defendant's breach of one or more of its duties is a proximate cause of S.B.'s

injuries and the damages sustained by Plaintiffs.

752.    As a direct and proximate result of each of the Defendant's breach of duties, S.B. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

753.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

### COUNT IX
### GROSS NEGLIGENCE
### (Against All Defendants)

754.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

755.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

756.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

757.    Each of the Defendant's respective products are also marketed and advertised to young adults and minors, including S.B..

758.    Each Defendant owed S.B. a duty to act as a reasonably careful company would under the circumstances.

759.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just

that.

760.    A reasonably careful company would protect S.B. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

761.    A reasonably careful company would not invite, encourage, or facilitate youth, including S.B. to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did not just that.

762.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

    a.  The Minecraft Defendants failed to disclose that they designed Minecraft with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a user's brain, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage and other injury such that the products pose significant risk of harm;

    b.  Roblox Corp. failed to disclose that it designed Roblox with addictive properties, including but not limited to using technologies, algorithms, and psychological tricks within the game to keep users playing and engaged with Roblox, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm;

    c.  InnerSloth failed to disclose that it designed Among Us with addictive properties, including but not limited to using technologies, algorithms, and psychological tricks within the game to keep users playing and engaged with

Roblox, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm;

d.  Subway Surfers Defendants failed to disclose that it designed Subway Surfers with addictive properties, including but not limited to using technologies, algorithms, and psychological tricks within the game to keep users playing and engaged with Roblox, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm;

e.  Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a user's brain, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage and other injury such that the products pose significant risk of harm;

f.  Sony failed to disclose that it Sony designed its PlayStation consoles, including PlayStation 4, with addictive features and for use with addictive video game products, and designed its PlayStation Network, including PlayStation Online Products/Subscriptions used by S.B., e.g. PlayStation Store and PlayStation Plus], with addictive features to be used with its PlayStation consoles and for product users to house, purchase, and use addictive video game products, to take advantage of the chemical reward system of users' brains,  while knowing

that abuse, addiction, and compulsive use by foreseeable users, like S.B, can lead to brain damage and injury and, as such, the products pose significant risk of harm;

g.   PUBG Defendants failed to disclose that it designed the PUBG Mobile games with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

h.   Dell and Dell Tech failed to disclose that they designed personal computers used for video gaming with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm; and

i.   Apple failed to disclose that it designed the Apple App Store to house addictive gaming products and pushed users to make purchases through the Apple Store, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury and, as such, the products pose significant risk of harm.

763.   S.B. was a foreseeable user of each of the Defendant's respective products.

764.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of S.B.'s use of each of the Defendant's respective products.

765.   Each Defendant consciously disregarded a substantial and unjustifiable risk that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by

youth, including S.B. in a reasonably foreseeable manner. More specifically:

    a.   The Minecraft Defendants designed Minecraft with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b.   Roblox Corp. designed Roblox to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

    c.   InnerSloth designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

    d.   Subway Surfers Defendants designed Subway Surfers to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage, abuse,

compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

e. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Sony designed its PlayStation consoles including PlayStation 4, with addictive features and for use with addictive video game products, and designed its PlayStation Network, including PlayStation Online Products/Subscriptions used by S.B., e.g. PlayStation Store and PlayStation Plus, with addictive features to be used with its PlayStation consoles and for product users to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g. PUBG Defendants designed PUBG Mobile with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.   Dell and Dell Tech designed personal computers used for video gaming to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm; and

i.   Apple designed the Apple App Store to take advantage of the chemical reward system of a user's brain  (especially a minor or neurodivergent person) to create addictive engagement, and pushed users to make purchases through the App Store, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

766.   At all relevant times, each Defendant consciously disregarded a substantial and unjustifiable risk of harm to youth, including S.B. which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

767.   Each Defendant consciously disregarded a substantial and unjustifiable risks S.B. and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

768.     Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

769.     Each Defendant's conduct was closely connected to Plaintiffs' injuries and damages, which were highly certain to occur.

770.     Each Defendant could have avoided Plaintiffs' injuries and damages with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed S.B..

771.     Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

772.     Each Defendant also owes a duty to not to engage in unfair or deceptive acts or practices, including but not limited to utilizing deception, fraud, false pretenses, misrepresentation, or concealment in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

773.     Each Defendant also owes a duty not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq.*, and Ga. Code §§ 10-1-390 *et seq.*

774.     Each Defendant's conscious disregard of the risks associated with its products constituted a gross deviation from the standard of care a reasonable company would exercise in the situation.

775.     Accordingly, each Defendant has grossly breached its standards of care owed to

Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those gross deviations from the standard of care include:

a. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including S.B.;

b. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including S.B. including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including S.B.;

d. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including S.B.; and

e. Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity

of users or by adopting ineffective age and identity verification protocols.

776.    Each Defendant has grossly breached its standards of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those gross deviation from the standard of care include:

  a.  Failing to implement effective protocols to block users under the age of 13;

  b.  Failing to implement effective parental controls;

  c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

  d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

  e.  Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

  f.  Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

777.    Each Defendant further grossly deviated from the standard of care and duty owed to Plaintiffs by failing to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

778.    Each Defendant also grossly deviated from the standard of care and duty owed to

Plaintiffs under Georgia law not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. *See* Ga. Code §§ 10-1-370 *et seq*., and Ga. Code §§ 10-1-390 *et seq*.

779.     Each Defendant also grossly deviated from the standard of care and duty owed to Plaintiffs under Georgia law not to engage in deceptive trade practices in the course of business. *See* Ga. Code §§ 10-1-370 *et seq*., and Ga. Code §§ 10-1-390 *et seq*.

780.     A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users including S.B.; yet Defendants did not do this. This was a gross deviation and breach of duties owed to Plaintiffs.

781.     As a direct and proximate result of each Defendant's gross breach of one or more of its duties, S.B. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

782.     Each Defendant's gross deviations from the standard of care proximately caused Plaintiffs' injuries and damages.

783.     As a direct and proximate result of each of the Defendant's gross deviations from the standard of care, S.B. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

784.     Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT X**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against All Defendants)**

785.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

786.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

787.    As described herein, each of the Defendants designed its respective products to be addictive to young adults and minors, including S.B. who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

    a.   The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

    b.   Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

c.  InnerSloth designed Among Us to be as addictive as possible and to include
    various addictive tactics, including but not limited to addictive feedback loops,
    fast-paced play, satisfying graphics and sounds, and other dopamine lifts;

d.  Subway Surfer Defendants designed Subway Surfers to be as addictive as
    possible and to include various addictive tactics, including but not limited to
    designing and developing an "endless game" with short term and long term
    rewards, microtransactions and operant conditioning AI based algorithms to
    wire in the dopamine response causing gaming addiction;

e.  Epic Games designed Fortnite to be as addictive as possible, employing
    numerous psychological tricks, tactics, and technologies to ensnare users into
    extended, compulsive, abusive, and addictive use of its product, including but
    not limited to, designing the game to include a "near miss" effect, random
    rewards, bright and vibrant colors, and continual gameplay variety;

f.  Sony designed its PlayStation consoles with addictive features and for use with
    addictive video game products, and designed its PlayStation Network
    (including but not limited to its PlayStation Store and PlayStation Plus) for use
    with its PlayStation consoles and to supply and house addictive video game
    products, to take advantage of the chemical reward system of users' brains;

g.  PUBG Defendants designed PUBG Mobile to be as addictive as possible and
    includes various addictive tactics, including but not limited to varied gameplay,
    daily freebies, various cosmetic items to earn or purchase, and rank determined
    by amount of play;

h.  Dell and Dell Tech designed personal computers used for video gaming with psychologically addictive features, including but not limited to lack of or weak parental or school controls to limit gaming access; and

i.  Apple designed the Apple App Store with psychologically addictive properties and technologies to encourage users to make purchases through the App Store.

788.  Each Defendant designed its respective products to take advantage of the chemical reward system of users' brains (especially young users, including S.B.) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.  The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

b.  Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

c.  InnerSloth designed Among Us in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

d.  Subway Surfers Defendants designed Subway Surfers in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

e.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

f.  Sony designed its PlayStation consoles, PlayStation Network, PlayStation Store and PlayStation Plus in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minor and young adult users continually purchase addictive video game products for play on PlayStation consoles and/or PlayStation Network in order to ensure the addiction of minor users;

g.  PUBG and Krafton designed PUBG: Battlegrounds in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

h.  Dell and Dell Tech designed personal computers used for video gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals; and

i.  Apple designed the Apple App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

789.  Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, including S.B. to use each Defendants' respective product and for users, including S.B. to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

790.  Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community.

791.    Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was an abuse of power to affect the interests of users, including S.B..

792.    Each Defendant knew that users, including S.B. would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including S.B. after initial purchase or download.

793.    Each Defendant intended to inflict emotional distress (*e.g.*, causing addiction) on users, including S.B. and knew that users, including S.B. would suffer emotional distress as a result of Defendants' conduct.

794.    Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct. More specifically, the family has endured S.B.'s bouts of gamer's rage and depression which has required out-patient counseling and additional support services in school.

795.    Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community and Defendants knew there was a high probability the addicted minor would have gamer's rage and withdrawal symptoms which would cause emotional distress to the gamer, parents, and other household members.

796.    No reasonable person would be expected to endure such emotional distress suffered by Plaintiffs as a result of each Defendant's conduct.

797.    S.B. was particularly susceptible to emotional distress from each Defendant's

respective conduct due to S.B.'s age and mental capabilities.

798.     As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Nichelle Broussard has experienced extreme emotional distress, extreme financial stress, family conflict (including fear of being injured or hurt by S.B. if Nichelle Broussard tries to prohibit S.B. from using Defendants' products), and mental anguish, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

799.     As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, S.B. has experienced extreme emotional distress, including depression and anxiety related to S.B.'s inability to function at grade level without additional support services in the classroom and out-patient counseling, and mental anguish associated with the effects of S.B.'s gaming addiction.

800.     As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

801.     Further, each Defendant's outrageous conduct, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

**COUNT XIV**
**FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

802.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

803.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

804.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

805.    Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

806.    These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

   a.    The Minecraft Defendants misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users;

   b.    Roblox Corp. misrepresented the Roblox games as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been

designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Roblox poses significant risk of harm to users;

c.   InnerSloth misrepresented Among Us as safe for use by minors and neurodivergent individuals, including S.B., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, and knowing that it had designed and developed Among Us to be as addictive as possible;

d.   Subway Surfers Defendants misrepresented Subway Surfers as safe for use by minors and neurodivergent individuals, including S.B., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, and knowing that it had designed and developed Subway Surfers to be as addictive as possible;

e.   Epic Games misrepresented Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals, including S.B., while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

f.   Sony misrepresented that its PlayStation consoles and PlayStation Network, including PlayStation 4 used by S.B. PlayStation products used were safe for use by all, including minors, young adults, and neurodivergent individuals, while knowing that these products were designed and developed with addictive

features to keep users using Sony's video game products, playing video games, and purchasing addictive video game products, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that its products pose significant risk of harm to users, like S.B.;

g.  PUBG Defendants misrepresented PUBG Mobile as safe for use by minors and young adults, including I.C., while knowing that abuse, addiction, and compulsive use by youth can lead to injury, and knowing that it had designed and developed PUBG: Battlegrounds to be as addictive as possible;

h.  Dell and Dell Tech misrepresented their personal computers as safe for use by minors and neurodivergent individuals, including S.B., while knowing they had been designed and developed with addictive psychological features to keep users playing games more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, such that the Dell computers pose significant risk of harm to users; and

i.  Apple misrepresented that its Apple App Store was safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users, like S.B., purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users.

807.  Defendant knew their games posed risk to minors, including S.B. based on internal research and external studies known in the industry and to each Defendant; yet each Defendant

misrepresented the safety and value of their games for the purpose of inducing users, including S.B. to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

808.    Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

a.    The Minecraft Defendants marketed Minecraft as "educational" and for use in the classroom despite knowing that its Minecraft games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by S.B.;

b.    Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by S.B.;

c.    InnerSloth marketed Among Us as safe for play by youth, despite knowing that Among Us contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by S.B.,

d.    Subway Surfers Defendants marketed Subway Surfers as safe video game to play in your free time, despite knowing that Subway Surfers contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth

and neurodivergent people, and the harms that arise therefrom and that have been experienced by S.B.;

e.   Epic Games marketed Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals (in and outside the classroom), despite knowing that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by such users leading to brain damage and other damages that arise therefrom, and that have been experienced by S.B.;

f.   Sony knew that its PlayStation consoles, PlayStation Network, PlayStation Store and PlayStation Plus products, as well as Fortnite video games played on PlayStation 4, contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of Fortnite video games played by S.B. on PlayStation 4, and other games designed, developed and utilizing the patents and technology described herein;

g.   PUBG Defendants marketed PUBG Mobile as safe for use despite knowing that its PUBG Mobile games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by S.B.;

h.   Dell and Dell Tech marketed their personal computers as safe for use by youth, even marketing to and selling to school districts and schools for in-classroom use, despite knowing that these personal computers could and would be used for video gaming, and thus contained an inherent risk of brain damage, abuse,

addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by S.B.; and

i.   Apple marketed the App Store for youth to utilize, despite knowing that the App Store, as well as the Roblox games, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and thus contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by S.B.

809.   By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

810.   Each Defendant knew that its misstatements and false representations, as identified herein, were material.

811.   Each Defendant knew that its misstatements and false representations, as identified herein, were false.

812.   The misrepresentations described herein were made to Plaintiffs—particularly to S.B.—prior to their purchase of each Defendant's product and to S.B. while S.B. was using Defendants' products as intended.

813.   Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's

product.

814.    S.B. and S.B.'s parent, Nichelle Broussard, relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

815.    Plaintiffs' reliance on the material misrepresentations of each Defendant when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product was justifiable.

816.    As a direct and proximate result of the material misrepresentations and false statements of each Defendant, *i.e.,* Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

817.    As a direct and proximate result of each of the Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs have been damaged. Such damage includes S.B.'s mental harm (and the permanency thereof); pain and suffering; mental anguish; S.B.'s inability to function at grade level without additional supportive services; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to S.B.'s mental harm. Further, S.B.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

818.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

819.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, including Plaintiffs, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XI
## FRAUDULENT CONCEALMENT
### (Against All Defendants)

820.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

821.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

822.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly young adults and minors, including S.B.

823.    Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

      a. The Minecraft Defendants designed the Minecraft games with addictive psychological features to take advantage of the chemical reward system in user's brains and keep users playing more often and longer, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals

can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

b. Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

c. InnerSloth designed Among Us with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiffs;

d. Subway Surfers Defendants designed Subway Surfers with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiffs;

e. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use

by such users (particularly minors and neurodivergent people) can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

f.  Sony designed its PlayStation consoles  with addictive features and for use with addictive video game products, designed its PlayStation Network, including PlayStation Online Products/Subscriptions used by S.B., e.g. PlayStation Store and PlayStation Plus, with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, but concealed this information from the public, product users, and parents, including Plaintiffs;

g.  PUBG Defendants designed PUBG Mobile with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

h.  Dell and Dell Tech designed personal computers used for video gaming with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiffs; and

    i.   Apple designed the Apple App Store with addictive features and to house addictive gaming products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs.

824.    Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings to induce youth, including S.B. to continue using its respective products and avoid losing users and revenue.

825.    By intentionally concealing material information, including, but not limited to, concealing the risk of abuse, addiction, and compulsive use designed in each of its respective products, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

826.    Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

827.    Each Defendant knew the misrepresentations it made to Plaintiffs regarding its products were falsehoods and made such representations regardless.

828.    Each Defendant knew the misrepresentations it made to Plaintiffs were material.

829.    At the time each Defendant utilized these technologies to induce S.B. to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice S.B. to become addicted and continue spending.

830.    Each Defendant intended its fraudulent in-game content to induce S.B. to continue purchasing in-game downloadable content and/or in-game transactions within its respective

product.

831.     A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

832.     If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be addictive, then Plaintiffs would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game transactions in each Defendant's product.

833.     S.B. reasonably and justifiably relied on the representations each Defendant's made regarding its products to make several in-game purchases.

834.     As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

835.     As a direct and proximate result of each Defendant's concealment of material information, S.B. has been injured and Plaintiffs have sustained damages, as described herein.

836.     Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

837.     Further, each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious

and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

838.    Defendants' fraudulent concealment tolls any applicable statute of limitations.

## COUNT II
## FRAUDULENT INDUCEMENT
### (Against All Defendants)

839.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

840.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

841.    Within these products, each Defendant included the ability for users, including Plaintiffs, to purchase in-game downloadable content or microtransactions.

842.    Users of Defendants' products, including minors such as S.B. were induced into microtransactions by each Defendant to make such purchases through false representations and material misstatements built into each of the Defendants' products. Defendants' methods of fraudulent inducement include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like Plaintiff, that game-selected purchases would help them advance in the

game or complete necessary missions.

843.   Defendants made these false representations and material nondisclosures with intent to induce S.B. into the microtransaction.

844.   At the time each Defendant utilized these technologies to induce S.B. to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice S.B. to become addicted and continue spending.

845.   Each Defendant intended its fraudulent in-game content to induce S.B. to continue purchasing in-game downloadable content and/or in-game transactions within its respective product.

846.   At the same time, each Defendant knew that the inducements to make additional in-game purchases served only to increase the inherent risk of danger to users, including S.B. specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

847.   S.B. reasonably and justifiably relied on the enticements within each Defendant's product to make several in-game purchases that had little to no value to S.B. within the game.

848.   Had S.B. known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, S.B. never would have agreed to purchase in-game downloadable content or microtransactions.

849.   Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, including S.B..

850.   Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly concealed those findings, to avoid losing revenue, and to induce S.B. to continue using each Defendant's respective products.

851.   In conjunction with Defendants' acts of concealment, each Defendant knowingly and recklessly misled the public, users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

852.   Each Defendant intended its concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

853.   By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

854.   As a direct and proximate cause of each of the Defendant's deceptive and fraudulent conduct, S.B. is addicted to Defendants' respective products and is unable to refrain from gameplay or in-game purchases.

855.   Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, including S.B. would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

856.   A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the

use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Plaintiffs justifiably relied on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

857.    As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

858.    As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each of the Defendant's inducements to utilize their platforms, download and play their games, and/or continuously spend funds through its products.

859.    As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs have been damaged. Specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions to parents that minors gaming behavior is collected and tracked and nondisclosure of the risk of gaming addiction, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

860.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including

to the health, safety, and welfare of their customers, including Plaintiffs, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

**COUNT XIII**
**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants)**
**(Pleaded in the Alternative)**

861.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

862.    Plaintiffs plead this in the alternative.

863.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by S.B.: Minecraft, Roblox, Dell laptop, and iPhone.

864.    Each Defendant---and all designers, developers, manufacturers, publishers, and suppliers of video gaming products---had a duty to communicate accurate information and to make truthful statements of material fact to the public. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of Defendants' products and that those products posed serious health risks to users, particularly youth.

865.    As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors, including S.B.; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including

Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use:

    a.   The Minecraft Defendants misrepresented Minecraft as safe for use by minors and young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals that can lead to brain damage and injury;

    b.   Roblox Corp. misrepresented Roblox as safe for use by minors and young adults, even marketing the games as "educational" and safe for use by all, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

    c.   InnerSloth misrepresented Among Us as safe for use by minors and young adults, even marketing Among Us as safe for play by youth, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

    d.   Subway Surfers Defendants misrepresented Subway Surfers as safe for use by minors and young adults, even marketing Subway Surfers as safe for use by minors and adults, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

    e.   Epic Games misrepresented Fortnite as safe for use by minors, young adults, and neurodivergent individuals, even marketing the games as "educational" and

for use in classrooms, despite knowing that, due Fortnite's product design, the video game contains an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

f.   Sony misrepresented its PlayStation consoles and its PlayStation Network, PlayStation Store, and PlayStation Plus products, as well as Fortnite video games played by S.B. using PlayStation products as safe for use by minors, young adults, and neurodivergent individuals, even marketing the products toward such users, despite knowing that, due to their own design, Sony's video game products contain an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals that can lead to brain damage and injury;

g.   PUBG Defendants misrepresented PUBG Mobile as safe for use by minors and young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to it's own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

h.   Dell and Dell Tech misrepresented its personal computers as safe for use by minors and young adults, even marketing and selling personal computers used for video gaming to schools and school districts for use in the classroom, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury; and

   i. Apple misrepresented its Apple App Store as safe for use by minors and young adults, even marketing the App Store toward youth, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury.

866. Each Defendant made these false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

867. Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

868. Defendants' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use Defendants' products—and Nichelle Broussard relied upon Defendants' false statements and misrepresentations in allowing S.B. to use Defendants' games and gaming products, Likewise, S.B. relied on Defendants' false statements and misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms, including the use of fake "friends" to induce S.B. into spending money.

869. Plaintiffs' reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

870. Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and

harms to Plaintiffs, described above, including but not limited to S.B.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's material misrepresentations, S.B. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

871.    Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

**COUNT XIV**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

872.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

873.    Under OCGA § 16-14-4 (b), it is "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or directly, such enterprise through a pattern of racketeering activity.

874.    A civil conspiracy occurs when two or more persons have combined to accomplish a purpose that is unlawful or oppressive, or to accomplish some purpose (that is not in itself unlawful, impressive, or immoral) by unlawful, oppressive, or immoral means to the injury of another. Such a conspiracy occurred here.

875.    Defendants demonstrated racketeering activity by committing at least two or more predicate offenses.

876.   Defendants conspired to make Defendants' products, specifically the products described herein, addictive to users, including S.B..

877.   As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like S.B., with unfair and deceptive trade practices to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by S.B. and other users.

878.   Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like S.B. addicted to Defendants' products.

879.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like S.B. with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

880.   As described herein, the Minecraft Defendants knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users, and with Dell and Dell Technologies to violate Ga. Code §§ 10-1-370 et seq., and Ga. Code §§ 10-1-390 et seq. to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

881.   In particular, the Minecraft Defendants, Dell, and Dell Technologies knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a

common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from Minecraft, a harmful video game product that addicted and harmed S.B.

882.   As described herein, Sony conspired with and acted in concert with Epic Games who make games available and that S.B. played on the PlayStation products to distribute, market, supply, and/or sell the Fortnite video games on the PlayStation 4 consoles and all in-game downloadable products and in-game purchases contained therein through the PlayStation Network; to design their video game products to be addictive; to violate the OCGA § 16-14-4 (b), to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs; to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

883.   In particularly, Sony and Epic Games knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from consumers purchase and use of Fortnite games on the PlayStation 4 console and/or network and played by S.B. and all in-game downloadable products and in-game purchases made available through the PlayStation Network, and that addicted and harmed S.B.

884.   As described herein, Roblox Corp., InnerSloth, and the Subway Surfers Defendants and Apple knowingly conspired and otherwise acted in concert with Apple, Inc. to violate Ga. Code §§ 10-1-370 et seq., and Ga. Code §§ 10-1-390 et seq. to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as

identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

885.   In particular, Roblox Corp., InnerSloth, the Subway Surfers Defendants and Apple, Inc. knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from their harmful Roblox video game product, and that addicted and harmed S.B.

886.   As described herein, Epic Games knowingly conspired and otherwise acted in concert with Dell, Apple, Minecraft, and Sony to violate the Georgia OCGA § 16-14-4 (b), to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

887.   In particular, Epic Games and Dell, Apple, Minecraft, and Sony knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that addicted and harmed S.B.

888.   As described herein, PUBG Defendants knowingly conspired and otherwise acted in concert to violate the OCGA § 51-6-1 by fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the PUBG: Battlegrounds game series to addict minors and young adults.

889.    In particular, PUBG and Krafton knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful PUBG: Battlegrounds games that addicted and harmed S.B.

890.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including S.B. while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

891.    Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including Plaintiffs.

892.    These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users.

893.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

894.    Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

895.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, S.B. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective design and Defendants' failure to warn consumers, including S.B.

about the addictive qualities and components of those products.

## COUNT XV
## IN-CONCERT LIABILITY
### (Against All Defendants)

896.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

897.    In-concert liability arises where one party acts together with another party who commits a tort. The party acting in concert with the tortfeasor becomes liable for the tortfeasor's conduct as if there was a joint enterprise or mutual agency.

898.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like S.B. with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by S.B. and other users.

899.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like S.B., addicted to Defendants' products.

900.    More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like S.B. with unfair and deceptive trade practices to maximize profits off the addictive nature of the products.

901.    Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

902.     Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth, including S.B. arising from the harmful content contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

903.     Additionally, Apple and Dell acted in concert with each of the other Defendants to place addictive games and technology on its platforms and encourage the purchase and use of such content by minors and young adults.

904.     Apple and Dell do not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor, including S.B. can spend playing games.

905.     As described herein, Roblox, Inner Sloth and Subway Surfers Defendants knowingly acted in concert with each of the other Defendants to place addictive games and technology on its platforms and encourage the purchase and use of such content by minors and young adults.

906.     In particular, Roblox, InnerSloth, the Subway Surfers Defendants, and PUBG Defendants  knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Subway Surfers video game that addicted and harmed S.B.

907.     Each Defendant thus assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

908.     Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users, including Plaintiffs.

909.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

910.    Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

911.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products.

912.    As a proximate result of Defendants' concerted actions and conspiring to make their games addicting, S.B. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of S.B.'s addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products.

## VII.    PRAYER FOR RELIEF

913.    Plaintiffs Nichelle Broussard, individually and on behalf of S.B. a minor, respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

    a.  For an award of compensatory damages for S.B. in an amount to be determined at trial on the following elements of damage:

        i.  The nature, extent, duration, and permanency of S.B.'s injuries;

        ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

        iii. The present value of all necessary medical care, treatment, and services

including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future in accordance with the Family Expense Act;

    iv.  The loss of a normal life;

    v.  The pain, suffering, and mental anguish experienced in the past;

    vi.  The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

    vii.  The present value of any loss of ability to earn in the future;

    viii.  The reasonable expense of any necessary help in S.B.'s home or school which has been required as a result of S.B.'s injuries; and

    ix.  The present value of any necessary help in S.B.'s home or school reasonably certain to be required in the future;

    x.  Actual financial loss;

b.  For an award of compensatory damages for Nichelle Broussard, in an amount to be determined at trial, to fairly compensate Nichelle Broussard for mental anguish, emotional distress, pain and suffering;

c.  For an award of actual damages for Plaintiffs, including economic and pecuniary loss, in an amount to be determined at trial;

d.  For injunctive relief;

e.  For an award of punitive damages for Plaintiffs in an amount to be proven at trial;

f.  For an award of fees, costs, and attorneys' fees, as allowable by law;

g.  For pre-judgment and post-judgment interest, as allowable by law; and

h.   For such other and further relief as this Court may deem just and proper.

## VIII.     JURY DEMAND

914.    Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted, this 19th day of April, 2024.

**BULLOCK WARD MASON LLC**

/s/ Tina M. Bullock
Tina Bullock GA Bar No 121791

**BULLOCK WARD MASON, LLC**
3350 Riverwood Pkwy, Suite 1900
Atlanta, Georgia 30339
(833) 296-5291
(833) 895-2022 (facsimile)
tina@bwmlaw.com

and

Richard Meadow, Esq. (*PHV Pending*)
**THE MEADOW LAW FIRM, LLC**
2390 E. Camelback Rd
Unit 403
Phoenix, AZ 85016
rmeadow@meadowlawfirm.com

*Attorneys for Plaintiffs Nichelle Broussard, Individually and on behalf of* S.B. *a minor*